CONTINENTAL LAND CO. et al. v. UNITED STATES. *

No. 8162.

Circuit Court of Appeals, Ninth Circuit.

Feb. 15, 1937.

*Rehearing denied May 3, 1937.

I. K. Lewis, of Duluth, Minn., Parker W. Kimball and F. J. McKevitt, both of Spokane, Wash., Edward H. Chavelle, of Seattle, Wash., and Charles Aten, of Wilbur, Wash. (Bradley W. Young, of Spo-

kane, Wash., W. E. Southard, of Ephrata, Wash., and John M. Prins, of Minneapolis, Minn., of counsel), for appellants.

J. M. Simpson, U. S. Atty., of Spokane, Wash., and B. E. Stoutemyer, Dist. Counsel, Bureau of Reclamation, of Portland, Or., for the United States.

Before GARRECHT and HANEY, Circuit Judges, NETERER, District Judge.

NETERER, District Judge.

The United States seeks to determine compensation to be paid for lands described in the petition appropriated by it pursuant to Act of Congress June 17, 1902 (32 Stat. 388) "An Act Appropriating the receipts from the sale and disposal of public lands in certain States and Territories to the construction of irrigation works for the reclamation of arid lands." The Secretary of the Interior, as such official and as Federal Emergency Administrator of Public Works, pursuant to Act of June 16, 1933 (48 Stat. 195), "An Act To encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes," has caused surveys and investigations to be made of the Columbia Basin Project on the Columbia river having for its purpose "regulation of the flow of said stream by storage reservoirs" and "coordinated development and use of said stream for the various purposes for which it is adapted, including navigation, hydro-electric power, flood control and irrigation, including irrigation of public lands of the United States." The said surveys and investigations so made having particular reference to immediate plans for construction of a dam across the Columbia river at the head or near the Grand Coulee. The said dam is to constitute the first unit and an integral part of a larger Grand Coulee Dam, which will form a basis of the complete Columbia Basin Project and serve as the diversion dam, and also as principal storage reservoir to regulate the flow of the Columbia river for flood control and will serve the purposes of navigation and power development at all points on such stream below the Grand Coulee Dam. The corps of engineers, United States Army, under appropriations made by the Congress for that purpose, have conducted investigations for the purpose of determining the best use of the waters of the Columbia river and its tributaries for the purposes to which adapted and have adopted a co-ordinated plan for the development and use of the Columbia river for navigation, flood control and irrigation, and for the development of electrical energy to pay the cost of the proposed construction, and for irrigation, industrial, and domestic use. The said plan includes the construction of various dams at different points on the Columbia river, the uppermost of which is the Grand Coulee Dam, which is the key structure and will provide the necessary storage capacity to store the peaks of the Columbia river waters by storing the floods and releasing the waters stored during the low water season, and will improve the flow of said river for navigation, power and irrigation and will reduce the flood dangers on its lower part. The estimate shows that the storage to be made available behind the Grand Coulee Dam will double (approximately) the amount of firm power which can be developed at each of the proposed dam sites between the Grand Coulee and the mouth of the Snake river and will increase by about 50 per cent. the amount of firm power which can be developed at each of the dam sites below the mouth of the Snake river, and that the increased amount of the firm power so made possible by reason of the storage behind the Grand Coulee Dam is an important factor in the feasibility of each of said lower dams as a self-liquidating project. Pursuant to the provisions of the act of June 16, 1933, supra, the Emergency Public Works Board and the Emergency Public Works Administration, under the authority of the President of the United States, allocated for the construction of said first unit dam and appurtenant structures from the Emergency Public Works Fund available, a sum of money estimated as sufficient to construct said dam and acquire the necessary rights of way therefor, and pursuant thereto the Secretary of the Interior and Emergency Public Works Administrator have authorized the construction of said dam and the reservoir to be formed thereby and the acquisition of the necessary rights of way therefor.

The testimony tends to show that the proposed dam at the present will serve the purposes of a diversion dam for the Columbia Basin Project, the improvement of navigation by creating a lake 150 miles long, running from the dam to the Canadian Border and by regulation of the low flow of the river and increasing it, will improve navigation all the way from the

dam site to the Coast; that the foundation, including construction of 200 feet below the high-water line of the river, is necessary before any head can be secured for power development purposes. The cost of putting in the foundation before any head is secured for power development purposes is about $60,000,000. The completed structure will cost $197,000,000. The nearest tribal land of the Colville Indian Reservation is half a mile above the dam. This reservation extends along the side of the river for over 100 miles. It is not possible to construct a dam at that site without flooding both the allotted and the tribal lands of the Colville Indian Reservation. The Spokane Indian Reservation land will likewise be flooded by the back waters.

The Rivers and Harbors Act of August 30, 1935 (49 Stat. 1039), then pending before Congress and which shortly became a law, contained this provision: "That for the purpose of controlling floods, improving navigation, regulating the flow of the streams of the United States, providing for storage and for the delivery of the stored waters thereof, for the reclamation of public lands and Indian reservations, and other beneficial uses, and for the generation of electric energy as a means of financially aiding and assisting such undertakings, the projects known as 'Parker Dam' on the Colorado River and 'Grand Coulee Dam' on the Columbia River, are hereby authorized and adopted, and all contracts and agreements which have been executed in connection therewith are hereby validated and ratified, and the President, acting through such agents as he may designate, is hereby authorized to construct, operate, and maintain dams, structures, canals, and incidental works necessary to such projects, and in connection therewith to make and enter into any and all necessary contracts including contracts amendatory of or supplemental to those hereby validated and ratified." Section 2.

It was stipulated at the trial that the back water from the Grand Coulee Dam now under construction will flood about 18,000 acres of privately owned land, divided into 600 tracts and in 900 different ownerships, also some public lands of the United States, including both tribal and allotted lands. That prior to commencing this proceeding the Columbia Basin Commission secured a permit to appropriate under the state law 100,000 second feet of the water of the Columbia river for use in connection with the Columbia Basin Project, and it will assign such permit to the United States for the purposes of this project. That the lands which will be flooded by the back waters of the dam also include uplands and riparian lands of the state of Washington, and lands in the bed of the stream. That on January 4, 1934, the Secretary of the Interior filed with the State Commissioner of Public Lands of the State of Washington a list showing the various tracts of state lands to be used in whole or in part for the purposes of said project; and that the dam, for all purposes, is situate on the only feasible dam site on the Columbia river.

The physical structure of the river bed adjoining the lands is a granite formation and entirely suitable for a dam. The banks of the river have a particularly suitable granite formation. The top of the dam when completed will be approximately 4,200 feet in length, and 180 or 1,900 feet of the dam on each side of the river will rest upon the appellants' uplands. The Consulting Engineer of the government said it would not be feasible for private capital to develop the Grand Coulee Project.

Another hydraulic engineer for the government said the development of the Grand Coulee by private capital would not be feasible.

The hydraulic engineer for appellants said that the inherent adaptability and peculiar fitness of the appellants' land for use as a dam site was in the granite dike which has been cut by the Columbia river to a depth of 600 feet, which does not exist elsewhere on the river. From the International Border to the mouth of the Snake river there is no place where there is a fall or head sufficient to generate any commercial power. The dam built on appellants' land creates a fall or head of 350 feet, which their engineer says is a little more than twice the head of Niagara Falls. The dam also creates a reservoir to store water upstream, which regulates the stream flow. Every foot of the fall or head is produced by the dam. The site on which the dam is built, the same expert says, becomes of primary importance and is indispensable to the development of the water power. The reservoir created behind the dam will increase the uniform flow of the Columbia river from 18,000 to 41,500 cubic feet per second.

The granite formation also extends across the river bed and upward to about

600 feet above the river on either side. No other place on the river has such characteristics.

It is also testified that it would not be practical to construct a dam anywhere else on the Columbia river which would serve the dual purpose of power and irrigation. It would be physically impossible to construct a dam on the Columbia river without using the lands which are being taken in this proceeding, "no matter how much money you wanted to spend."

Another engineer for the appellants says that private capital is always ready for a proposition of that kind which will show a profit, and that without the development of power at Grand Coulee there will be an actual shortage of power necessary to supply the area.

Another engineer said he had examined the Grand Coulee Dam site; that he has probably never seen a dam site as good; and that it was entirely feasible and practical for private capital to acquire such lands as a dam site in 1933, and utilize it for beneficial purposes and that there was a market for such lands.

Some of these witnesses on cross-examination stated they did not know why private capital did not purchase these lands and had not sufficient knowledge to answer the question as to why the property was not purchased in 1929. Others testified that there is no market for such dam site purposes, and "that the discussion about the Grand Coulee project during recent years has been a discussion with reference to the attempt to get the Government interested in building that project and there never has been any private enterprise contemplated, * * *. in all that time for development of the project." There was no market for a dam site of such size as this location. Another witness testified that none of the lands had a market value for a dam site or reservoir in 1933.

Another engineer for appellants testified he was a graduate from Rensselaer Polytechnic Institute; had been employed by the Provincial Government of the Philippine Islands, by the New York State Barge Canal as a designer of dams and locks and many other concerns and places, including the Beauharnois Development Company in Canada, Connecticut River Power Company, Muscle Shoals steam plant water supply for the United States government and Arco Nitrate plants at Alabama; likewise on the Los Angeles Flood Control District on the San Gabriel Dam, and to serve among others the New York Power & Light Co., North New York Utilities, Black River Irrigation District, Hudson River Irrigation District, Malone Light & Power Company, Soviet Government of Russia, Cities Service Company and Niagara-Hudson Power Company; that he has studied and reported on Niagara-Hudson Power Company holdings on the St. Lawrence river; and that he had done work on such projects in 35 different states and a number of foreign countries, and knows the need and desirability of dam sites.

On cross-examination he said, "The St. Lawrence project which I referred to is close to Malone, Bernhardt Island, St. Lawrence River. The population within a radius of 300 miles of that location is perhaps 10,000,000 to 15,000,000. I would assume that it would be more than ten times as much as the population within 300 miles of Grand Coulee. The developments to which I refer as being somewhat near in size to this one are located in a territory where there is a very much larger population than is involved here." And then said with relation to demands for sites: "I do not know of any large sales of dam-site property at that location or anywhere else in that vicinity at that time, or at any time near that date. There was some purchase of property by the Niagara-Hudson Power Company for the St. Lawrence development during that period. Just exactly what dates I don't know. That is adjacent to a thickly populated country. I do not know of any such sales anywhere in the Northwest. No very large projects were constructed to my knowledge during the period of the depression. There were no hydro-electric developments started in the Northwest during the period between 1930 and 1934. There was no need for them at that time. During that time nobody would have financed such construction. Financing construction requiring $70,000,000.00 would be found very improbable. It would be foolish to construct a development where there was no necessity for power at that particular date, December, 1933. My recollection is that the Court records indicate about 600 owners in the reservoir site whose property would have to be secured before the reservoir could be used. I don't know what kind of procedure you would have to go through to get the Indian lands which would be indispensable for that project, or the withdrawn lands that were with-

108

drawn under Reclamation Act, or the state lands in the bed of the stream and the uplands. I do .not know the total of that. I am not basing my testimony on my knowledge, but on the Court records." And on redirect examination said, in response to the question: "Just a few moments ago you distinguished between financing the development of a power project at, the Grand Coulee and purchasing the site which is involved in this law suit. Will you please explain a little to us why you made that distinction?" A. "My distinction is based on the knowledge that private companies are always on the lookout for damsites to keep up with the market. Unless our economical structure is going to fall down flat the companies which are existing today to take care of the market and provide manufacturing power have just got to keep developing and supplying that market, and in order to do that they have got to look ahead and make plans and arrange for these damsites. They have got to locate them and buy them. * * *"

He further said on recross-examination: "I understand this damsite has been known for a great many years, at least ten or fifteen years. It was filed upon in 1922 by Colonel Cooper but the filing was denied, which I understand was because of the desire of the United States Government to hold it for themselves. I don't know why the filer· did not purchase the damsite at that time. I doubt very much if private capital would ever have built it in 1922. It is possible it might have acquired it in 1922. Why they did not, I don't know. The power market was growing much faster in 1929 than in 1933. 1929 was about the peak of growth. I do not know why private capital did not purchase it then, except that the previous effort to purchase it was denied on the ground that the Government wanted it. * * *"

The Columbia river is the second largest stream in the United States, larger than the St. Lawrence and surpassed in volume of flow only by the Mississippi. It carries more water than the combined flow of all the other streams of the Pacific Slope. It is unique among all the streams of the West in that it is the only stream which has broken through the mountain barrier of the Cascade and Sierra Nevada Mountains and created a navigable channel from the interior to the Pacific Ocean. It has been used extensively for navigation purposes ever since the earliest settlement by the white man, and even prior to that time was used by the Indians as a highway for such trade and travel as was carried on by them.

▓ The court will take judicial knowledge of the fact that the Columbia river is a navigable stream in fact as well as in law. Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154.

At the close of the trial the government moved to strike from the record all testimony in regard to the market value of lands in question for dam site purposes. The court, in granting the motion, said in part: "In the State of Washington the beds of navigable streams are not vested absolutely or qualifiedly in the owners of the shore lands along such navigable streams. The bed of navigable streams in the State of Washington is vested in the State of Washington. The decisions of the Supreme Court of the United States are at one upon this proposition, that the Congress of the United States has absolute control over the navigable streams within the borders of the country. It has that power in virtue of the provision of the Constitution of the United States which confers exclusively upon Congress the power to regulate commerce with foreign nations and among the several states and with Indian tribes. Navigable streams are great water highways, agencies and instrumentalities of commerce, and the dominant power of Congress to control the waters of such streams is clearly settled and determined by repeated decisions of the Supreme Court of the United States. The decisions of the Supreme Court of the United States are to the effect that riparian owners of shore lands along the banks of a navigable stream do .not have as against the United States, any interest in or title to the waters which flow in the stream when the United States undertakes to develop it or to improve those water highways for the purpose of advancing and improving navigation. That the land owner so owning these adjoining shore lands is not entitled to have any allowance made to him based upon any title to the bed of the stream or any allowance made to him for any right that he has because of the water running in the navigable stream or its potential water power. * * *"

Again the court said: "These owners, in my judgment, are not entitled to have that adaptability of this site taken into ac-

count for the reason they have neither title to the bed of the stream nor any right to the waters which flow in it as against the Government exercising dominant power to improve the stream for navigation purposes, and that they are not entitled to that because it has not been taken from them, and it hasn't been taken from them for the simple reason that they never owned it in the first place."

To which ruling, exception was duly taken and allowed.

The appellants requested several instructions that the jury could consider evidence in fixing the value of the land its adaptability for use as a dam site as well as all other uses to which the tract or parcel was adaptable. This request was denied and exception duly allowed.

The court fully and fairly instructed the jury upon every element to be considered in fixing just compensation to be awarded, which includes all elements of value that inhere in the property—not to exceed, however, the full, fair, cash market value of the property at the time of its taking, fairly and conscientiously arrived at, and not including the element of dam site valuation. And the controlling time in this case is December 27, 1933, being the date when the properties in question were appropriated.

The appellants excepted for the reason that the law required the submission of such issue to the jury, and also excepted to the refusal of the court to give the requested instruction relative to the valuation of the property for dam site purposes as the one statement of the law applicable to the case.

From the judgment upon the verdict this appeal is prosecuted.

The court could well rest affirmance upon the statement of Judge Webster in striking from the jury's consideration the evidence relating to dam site value. The magnitude of this project, and the legal issue involved, are of such importance that we have at the risk of prolixity deemed it proper to give more of detail than is usual in the statement of the case.

Title to the river bed is in the state of Washington. Article 17, § 1, Const.Wash.; section 7412, Rem.Rev.St.Wash. United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570; Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490, 44 L.R.A.(N. S.) 107.

As stated in the Chandler-Dunbar Case, supra, title to the bed of the river in the shore owner is qualified, and, unless severed or excluded by implication, passes with it as a shadow follows a substance, and while it is helpful as against acts of third parties, is of no avail against the absolute power of the Congress to improve navigation. The government has the power to cause the removal of obstructions in the river bed, and to forbid the use of the river by the riparian owner which it believes injurious to navigation. It has the right to cut the riparian owner from direct access to deep water. Scranton v. Wheeler, 179 U. S. 141, 21 S.Ct. 48, 45 L.Ed. 126. The judgment of the Congress with relation to the navigability of the river and its development is conclusive. Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154; United States v. Chandler-Dunbar Water Power Co., supra. So much of the riparian or "fast land" taken as is private property must be paid for at the reasonble market value. United States v. Chandler-Dunbar Water Power Co., supra. The general question of valuation was fairly submitted to the jury. The riparian owner has no property right to the use of the water or the power inherent therein, or the fall and flow of the water for commercial purposes, or any purpose, as against the United States. United States v. Chandler-Dunbar Water Power Co., supra. That "ownership [of] * * * the running water in a great navigable stream is capable of private ownership is inconceivable." United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, at page 69, 33 S. Ct. 667, 674, 57 L.Ed. 1063.

The appellant, however, contends that while the right to the river bed and to the flowing water of the river for navigation vested in the appellee, appellant had a claim of *inherent adaptability* in the uplands taken in the construction of the dam for "use in the development of electrical power." The development of electrical power in this case, it may be said, is purely incidental. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688.

The public right of navigation is the dominant right. The right to control such water for navigation is one of the great powers delegated to the United States for the purpose of regulating commerce. The Supreme Court, in discussing riparian rights to submerged land, said: "By necessary implication from the dominant right of navigation, title to such submerged lands is acquired and held subject to the power of Congress to deepen the water over such lands, or to use them for any structure which the interest of navigation, in its judgment, may require." Lewis Blue Point Oyster Company v. Briggs, 229 U.S. 82, 33 S.Ct. 679, 680, 57 L.Ed. 1083, Ann. Cas.1915A, 232.

By the same token the appellants have, as against the dominant right of navigation, no private property right in uplands *"adaptable to special use"* in connection with the flooding of such uplands by the construction of a dam for navigation purposes, above the reasonable market value to which the land is adaptable now or in the reasonably near future for any purpose (not including, however, any hypothetical additional value to the owner, who had no "right to appropriate the water to his personal use").

The following from the Supreme Court in United States v. Chandler-Dunbar Water Power Co., supra, 229 U.S. 53, at page 76, 33 S.Ct. 667, 677, 57 L.Ed. 1063, is decisive: "The government had dominion over the water power of the rapids and falls, and *cannot be required to pay any hypothetical additional value to a riparian owner who had no right to appropriate the current to his own commercial use.* These additional values represent, therefore, no actual loss, and there would be no justice in paying for a loss suffered by no one in fact. * * * 'The question is what has the owner lost, and not what has the taker gained.'" (Italics supplied.)

No persuasive merit is impressed by argument that the court in this case was dealing with water power as a separate unit of property and inherent adaptability of the land ("hypothetical additional value") as here contended for was not considered. All the expressions of the court in relation to each other, considered as a whole in disposition of the issue before it, are to the contrary.

It is axiomatic that if the riparian owner has no right to approach the river as against the right of navigation, he has no inherent right of value "adaptable to special use" over and above the reasonable market value of the upland for any purpose to which it may reasonably be adapted now, or in a reasonable time in the future. This was fairly submitted to the jury. This issue is no newly created relation or right, but has existed long prior to the private ownership in the land. The rights were fixed and relations established by the adoption of the Constitution.

The claim of appellants has no substance, it has no possessory status; it is based upon something which is not possessed, and not being possessed, it has to appellants no value, and appellants lost nothing. The *question is,* what have *appellants lost, not what appellee gained.* Boston Chamber of Commerce v. Boston, 217 U.S. 189, 194, 30 S.Ct. 459, 54 L.Ed. 725.

It may also be said that the lands had no inherent value for the purposes claimed by the appellants, unless in probable combination with other lands, for private use. There is no evidence that there was any reasonable probability of combination in a *reasonably near future,* or at all, of these lands for private use. No capital was seeking the lands for use. When diversity of ownership is considered (900 private owners—600 parcels) government lands, state lands, Indian reservation land, Indian allotted land, withdrawal of reclamation lands, the full control of the United States of the water and river bed for navigation (see Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236), the capital required for investment and consideration of the testimony of conditions in districts to which capital did go and judicial knowledge of the congressional attitude with relation to such permission, and the requirements for the granting of such benefits; the population in the tributary territory, and other hydroelectric plants, Priest Rapids, Washington Power Company, including Chelan Falls and a number of other subsidaries, Bonnesville, City of Seattle Department of Lighting (Steam Plant and Skagit Project), Federal Power Commission Project No. 552, and Project No. 1215, Puget Sound Power & Light Company, including following plants: (Nooksacke Falls, Baker River, White River, Shuffleton Steam), Tacoma Railway, Light & Power (including Lake Cushman plant), Idaho Light & Power Company, in tribu-

tary territory of the Grand Coulee Dam. Greeson v. Imperial Irr. Dist. (C.C.A.9) 59 F.(2d) 529, 530, at page 531; Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551, 13 Ann.Cas. 957; The Apollon, 9 Wheat. (22 U.S.) 362, 6 L.Ed. 111. There is not left the shadow of a doubt that there was no reasonable probability of utilizing this land by private capital. There was no offer of proof that this land was sought by private capital; that there was any movement to interest private capital. On the contrary, the testimony shows that all of the agitation had been for a government dam. The speculative theorizing of expert witnesses as to private capital's seeking this site for development is of no value. McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205, decided May 18, 1936, points the way. The owners' land was adaptable for growing sugar cane if supplied with water for irrigation. The owners offered to prove that they had facilities by which this water could be produced at a more reasonable expense than was delivered to other lands in the same community; that the raising of sugar cane was profitable; that there were available artesian basins of fresh water amounting to approximately 60,000,000 gallons per day; that they owned lands within these basins upon which wells may be sunk; that it was economically feasible to transport such water from these wells to the land in question; that use of such water was a reasonable certainty; that the cost of transporting the water would be less per million gallons than that incurred for other cane land on the Island of Oahu. This evidence was rejected. The offer of proof was denied and the Supreme Court held that the rule in condemnation cases is that the most profitable use to which the land can probably be put in the *reasonably near future* has a bearing on the market value; and the fact that such use can be made only in connection with other lands does not necessarily exclude it from consideration *if the possibility of such connection is reasonably sufficient* to affect the market value. (Italics supplied.)

There is no such record here. No proof was produced, no offer was made, of any possibility reasonably near or remote or at any time that the land would be or could be so used. There is no error.

Affirmed.