UNITED STATES v. 3,928.09 ACRES OF LAND, MORE OR LESS, IN McCORMICK COUNTY, SOUTH CAROLINA et al.

UNITED STATES v. 3,906.24 ACRES OF LAND, MORE OR LESS, IN McCORMICK COUNTY, SOUTH CAROLINA et al.

UNITED STATES v. 12,138.74 ACRES OF LAND, MORE OR LESS, IN McCORMICK COUNTY, SOUTH CAROLINA et al.

UNITED STATES v. 5,231.66 ACRES OF LAND, MORE OR LESS, IN McCORMICK COUNTY, SOUTH CAROLINA et al.

Civ. Nos. 786, 1033, 1038, 1073.

United States District Court
W. D. South Carolina, Greenwood Division.

Aug. 26, 1953.

John C. Williams, U. S. Atty., Greenville, S. C., W. Braxton Miller, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

David W. Robinson, Columbia, S. C., for Twin City Power Co.

Edgar A. Brown, Barnwell, S. C., J. D. Parler, St. George, S. C., A. R. McGowan, Charleston, S. C., for Annie P. Robinson.

WYCHE, Chief Judge.

In its acquisition of land for its Clark Hill development on the Savannah River, the United States in Civil Actions 786, 1033, 1038 and 1073 instituted between June 25, 1947 and July 5, 1950 has taken all of

the properties, with insignificant exceptions, of the respondent, Twin City Power Company, a South Carolina corporation. The Georgia properties of its wholly owned subsidiary, the Twin City Power Company of Georgia, have been taken by the United States in Civil Actions 432, 521 and 537 instituted between June 19, 1947 and July 13, 1950 in the Southern District of Georgia. For convenience these corporations are treated together as "Twin City".

The return of Twin City in each of the seven condemnation actions averred that its aquisition of these properties on both sides of the Savannah River was for the purpose of developing a unified site on which to generate and distribute hydro-electric energy, that the two corporations together had acquired all of the land necessary for the development of a 60 foot head with a dam at Price's Island, that the potential use of these properties for this purpose should be considered in determining the market value of the properties, and asked that the several actions be consolidated for trial.

After the motions of the United States to strike these returns on the ground that they claimed consequential damages, anticipated profits and compensation based on adaptability for the development of hydro-electric power, had been overruled by this Court and by the District Court for the Southern District of Georgia, U. S. v. 1532.63 Acres of Land, 86 F.Supp. 467, the issues in the South Carolina actions so far as they affected Twin City were consolidated and referred to Commissioners pursuant to the provisions of sub-division (h) of Rule 71A of the Rules of Civil Procedure, 28 U.S.C.A. A similar order, referring the issues in the Georgia cases to the same Commissioners was filed in the Southern District of Georgia. Each order authorized the Commissioners to hear the Georgia and South Carolina cases together.

The Commissioners held extended hearings and after mature consideration filed their Report with this Court and with the District Court for the Southern District of Georgia. The Commissioners found that the adaptability of these properties for use in the generation of hydro-electric energy was a factor entitled to consideration in determining their market value at the times of taking and fixed the just compensation to which the two Twin City corporations were entitled at a total figure of $1,257,033.20 which they allocated among the properties taken in the several civil actions on an acreage basis. (Report 65–67)

Objections filed by the United States and by Twin City, as provided in Rule 53(e) (2) bring the issues here for decision. Able and exhaustive written briefs have been filed by the attorneys for the parties on the questions presented by the objections to the Report of the Commissioners. For convenience oral arguments were heard jointly with Judge F. M. Scarlett of the Southern District of Georgia, who is filing his Decree disposing of the questions as they affect the lands involved in the Georgia actions.

The United States urges that the potential use of the Twin City lands by themselves or in combination with other lands for the production of hydro-electric energy because of their proximity to the Savannah River should not have been considered by the Commissioners in arriving at a value for these properties. (Objections I–VIII) This position poses the principal challenge to the Report.

Just compensation is usually measured by the market value of the property, taking into consideration all uses to which the property is presently devoted as well as other uses to which it may be adapted in the reasonably near future. In arriving at a fair market value all reasonable uses of the property, if not remote or speculative must be taken into consideration. The fact that the most profitable use of a tract of land can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect its market value. U. S. v. 1532.63 Acres of Land, D.C., 86 F. Supp. 467, 472; United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390; Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236; Grand River Dam Authority v. Grand-Hydro, 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64.

The evidence in this case shows that Twin City owned some 4,500 acres in fee, together with flowage rights over additional acres. These lands extended for some eleven miles along both sides of the Savannah River from Price's Island to Chamberlain's Ferry, including all of the land for dam site and reservoir purposes except 170 acres which would be needed for dam with a 60 foot head at Price's Island, all of the land save 400 acres which would be needed for a dam with a 60 foot head and provision for a five foot surcharge, all of the land save 1,250 acres which would be needed for a 70 foot head with a five foot surcharge, all of the land save 2,800 acres which would be needed for an 80 foot head with a five foot surcharge.

These properties included an excellent dam site at Price's Island where the river narrows between rock spurs to some 900 feet with vertical rock foundations, with excellent clay soil particularly useful in the building of an earth dam. The absence of railroads, major highways, utilities, and homes in the reservoir area above Price's Island minimized construction costs. Twin City owned in fee a strip of land for a railroad from the Price's Island dam site to the C. & W. C. Railroad at Modoc, S. C., over which construction materials and electrical equipment could be economically transported. At the time of taking the Georgia Power Company's high tension transmission facilities running within five miles of the Price's Island site furnished an excellent vehicle for marketing power.

The Twin City properties were capable of development for hydro-electric purposes at various heads. Dams at Price's Island were economically feasible for use in connection with a 60', 70', 80', 90' and 100' head. The properties were also valuable for use with other property in developing a reservoir with a dam down stream from Price's Island. At the time of taking there was an ample and growing market for all of the energy which could be produced and at that time the power would have had a premium value for peaking purposes.

The drainage area of the Savannah River at Price's Island is 5,960 miles. For more than 99½% of the time the stream flow at that point is 2,200 cubic feet per second, and for 82% of the time 4,000 cubic feet per second. This stream flow exceeds that of every hydro development in North Carolina, South Carolina and Georgia, except those on the Savannah River at Stevens Creek and Clark Hill and on the Santee River at Pinopolis. (Report 45)

Studies by the engineers show that the development of energy by water at Price's Island would have been more economical than the development of a comparable amount by steam. The expert witnesses, including engineers placed on the stand by the Government, testified to the excellent potential of this property for hydro-electric purposes.

A comparison of this market value of the Twin City properties with the land cost of constructed projects on the basis of land cost per installed kilowatt and on the basis of the land cost to the annual output of kilowatt hours shows that the market value found here is a conservative figure. The same result is obtained if a comparison with completed hydros is made on the basis of the percentage of land cost to the total cost of the project.

 The Government's contention that a valuation of the Twin City properties should not include a consideration of their adaptability for water power purposes is based primarily on the testimony of the witness Russell Farley to the effect that after 1928 the Federal Power Commission would not have licensed a hydro-electric development with a dam at Price's Island because it considered that a better comprehensive plan for the development of the Savannah River basin between between the backwater of the existing Stevens Creek plant and the confluence of the Seneca and the Tugaloo required a dam at Clark Hill some six miles down stream from Price's Island and that without such Federal Power Commission license Twin City could not have built this project. 16 U.S.C.A. §§ 803, 817. The fact that the Federal Power Commission might not have licensed the project for a dam at Price's Island does not determine the issue of whether the Twin City properties were adaptable for water power purposes within the reason-

ably near future. Olson v. United States, supra. By preferring a dam at another site the Power Commission merely said that the best development of Twin City properties is in combination with other properties for a higher dam and larger reservoir. The Federal Power Commission does not, by determining the location of a licensed project, pass upon the right of the landowner to have the power potential considered in ascertaining just compensation. Grand River Dam Authority v. Grand-Hydro, 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64. To construe Federal action otherwise would raise grave constitutional doubts.

This evidence offered by the United States establishes the fact that the Twin City properties were adaptable for hydro power use in conjunction with downstream and upstream properties. The repeated studies of this stretch of the Savannah by the Federal Power Commission and by the Army Engineers to determine its power potential from 1928 until condemnation proceedings were instituted and their conclusion that it was one of the best hydroelectric sites in the eastern part of the United States is a determination that these Twin City properties were at the times of taking adaptable for use in the generation of electrical enegry.

All of the properties of Twin City and the entire eleven mile stretch of the Savannah River along which this land lay have been incorporated by the United States in its Clark Hill hydro development for water power purposes as its best and most valuable use. The testimony from both sides shows that during the entire period from 1901 to the date of taking Congress and all of the interested Federal agencies, without exception or dissent, considered that these properties of Twin City should be developed for water power, either by private interests or by the United States and either separately or in conjunction with other property.

The market value of any property is affected by the interest of the people in its purchase, because supply and demand are the economic levers of our free enterprise system. The Twin City properties have been considered for hydro purposes and al-most solely for those purposes since 1901 when Twin City began to piece together all of this property for those purposes. Congress through six different statutes passed between 1900 and 1919 authorized the construction of hydro-electric projects at Price's Island or at some other point on the Twin City properties. South Carolina and Georgia chartered each of the Twin City companies for the purpose of constructing hydro-electric projects. The Secretary of War and the Chief of Engineers in 1915 issued a permit to Twin City for construction and approved its plans. The Price's Island site was considered for construction when the Stevens Creek dam was built in 1912 and again when the Government established its nitrate plant in 1916 at Muscle Shoals. The Government's witness Bell and his associate Jackson optioned the property for hydro development in 1917. The Federal Power Commission tendered a preliminary permit to Twin City in 1926.

In 1928 the Federal Power Commission granted a license to the Savannah River Electric Company to construct a ninety foot dam near Clark Hill which would have absorbed and incorporated the Twin City properties. At that time negotiations for the purchase of the Twin City properties were had. Again in 1946 the Savannah River Electric Company wished to acquire the Twin City properties but was unable to obtain a license from the Federal Power Commission. From 1928 until the passage of the Flood Control Act in 1944, 33 U.S.C.A. § 701–1 et seq., the Federal Government studied and restudied the river for development in the interest of navigation, flood control and the generation of electric energy.

At the time of the first taking (June 1947) the United States and the Savannah River Electric Company were both anxious to build the Clark Hill project. Because the United States prevailed by refusing to issue a license to the Savannah River Electric Company does not alter the fact that the Twin City properties were in demand by two prospective purchasers. Savannah River Electric Company v. Federal Power Commission, 4 Cir., 164 F.2d 408.

Twin City offered three well qualified engineers, each with a wealth of experience in the design and construction of hydroelectric projects and in valuation of undeveloped power sites. Taking into consideration all of the relevant facts summarized herein and in the Report each arrived at a figure at which in his judgment a prudent, competent and well informed buyer, willing but not compelled to buy, would pay to an equally well informed, prudent and competent owner, willing but not compelled to sell, R. C. Johnson placed this figure at $1,-500,000, William P. Creager at $1,600,000 and Neville Courtney at $1,900,000. The Commissioners made an award aggregating $1,257,033.20.

In fixing this award the Commissioners began with the Creager valuation of $1,-600,000 and subtracted therefrom $343,966.-80 representing a "hold-up" cost which Twin City would have to pay for 745.58 acres covered by flowage or option easements, which the Report found had been abandoned, and of which 112 acres would have been needed for the sixty foot development at Price's Island. Twin City asks that the award be increased because these easements had not been abandoned and even if they had been abandoned the deduction was excessive for the reasons detailed in its objections (9, 13).

■ In arriving at market value the respondents' witnesses recognized that the owners of the lands over which these easements existed would, because of the many years which had elapsed, insist on additional payments. The Report, construed in its entirety, is a finding that $1,257,033.20 is the fair market value of all of the Twin City holdings, taking into consideration all of the factors of value, including their potential use for hydro-electric purposes, as of the respective dates of taking and therefore the "just compensation" which the United States should pay. This finding is supported by the weight of the evidence and will not be disturbed by this Court. Therefore, these objections (9, 13) of Twin City are overruled.

■ The United States (Objection VI) contends that flowage easements, paid for by Twin City and covered by recorded warranty deeds and covering 154.5 acres in South Carolina and 32 acres in Georgia, should be considered as abandoned because of the lapse of time between their respective dates and the dates of these proceedings. For the reasons given in the Report this objection is overruled.

Annie P. Robinson, by her deed of Jan. 16, 1907, conveyed 75 acres in fee to Twin City (Ex. 1, 148). At that time Mrs. Robinson owned some 2,600 acres in South Carolina, about 10 acres on the Georgia mainland and islands (Georgia) in the Savannah totalling 68 acres. The deed granted land known as the Searles land "being in the County of Edgefield" S. C.

"on and along the easterly side of Savannah River and along Benefield and Westcoat Creeks and including Searles Island * * * and land on the Georgia side of the River * * the line on the shore to run by and with the flood line and far enough back to include seventy-five acres hereby conveyed including said islands."

■ Twin City contends (Objections 1, 2) that forty of the acres conveyed in fee by this deed lie along the South Carolina side of the Savannah in Edgefield County. While the interpretation of this deed is not free from doubt, it is the Court's view that the Commissioners correctly concluded that all of this fee acreage lies in Georgia.

After finding the fair market value of all the Twin City properties, both in Georgia and in South Carolina, at $1,257,033.20 the Commissioners allocated this amount among the lands taken in each of the seven condemnation cases on an acreage basis. The United States takes the position (Objection V) that, since the first taking in C/A 432 on June 19, 1947, destroyed the unified character of the Twin City holdings, any value, attributable to the use of the unified site for power purposes must be awarded in C/A 432 as severance damages to the other Twin City property.

■ It is true that where a part of a landowner's property is taken and the remainder damaged, severance damages are appropriate. But here all of the Twin City

properties had been taken by the United States before trial was reached in C/A 432. It was taken piecemeal for budgetary and administrative reasons but all pursuant to the general plan to create a huge hydro-electric development as envisioned in the Flood Control Act of 1944. In such a situation severance damages are not appropriate. U. S. v. Miller, 317 U.S. 369, 63 S. Ct. 276, 87 L.Ed. 336. The Commissioners have reached a fair and permissible allocation by using an acreage basis.

Since the award to Twin City of $1,257,033.20 is not the value of its property for any particular purpose but represents its fair market value after considering all of the reasonable uses of the property which were not too remote or speculative, this amount is the "just compensation" required by the Fifth Amendment and the applicable statutes. U. S. v. 1532.63 Acres of Land, 86 F.Supp. 467, 470. This is the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236; Kimball Laundry Co. v. U. S., 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765.

The Report recognized that all values were included in this award but since the United States contended that the potential use of this property for water power should be excluded from consideration it was appropriate that the Commissioners find a value of the land based solely on its agricultural use. The Report fixed this value for each tract. This valuation averaged $28 per acre to which $5 per acre was added for Twin City's assembling the property. In so doing the Commissioners accepted the Georgia valuations of G. E. Ward and the South Carolina valuations of James J. Cox. Twin City objects to these findings (Objections 10–14) because they ignored entirely the testimony of Twin City's admittedly "competent land evaluators" and instead accepted the testimony of two government witnesses whose experiences were limited to buying for their own accounts and whose opportunities for study of the lands were limited. The United States objected to this determination because it disagreed with the Report's treatment of the evidence of timber value. (Objection IX)

Since the determination of value has been made as indicated herein it is not appropriate that the Court find a value based entirely on its use for agricultural purposes. As they are not now material the Report's findings of agricultural value are neither approved nor disapproved.

At the instance of the United States the Commissioners gave written notice to all possible claimants of the hearings in Georgia and in South Carolina. (Record, Vol. I, pp. 23–30, Volume V, pp. 4–14). The only parties appearing as claimants other than the Twin City corporations and William P. Dauchy, the mortgagee of their properties, were (1) the heirs of Nettie Blackwell; (2) the Augusta Power Company; (3) L. T. Anderson and (4) Annie P. Robinson. The Report satisfactorily passes upon all of the issues raised by these claimants.

The just compensation to which Twin City Power Company is entitled for its property (part of Tract C–215) taken in Civil Action 786 is the sum of $1,548.72 with interest thereon at 6% from June 23, 1947 to the date of the entry of judgment; for its property (Tracts F–500, H–700) taken in Civil Action 1033 the sum of $408,540.60 with interest thereon at 6% from December 21, 1949, to the date of entry of judgment; for its property (Tracts H–730, F–541 (part), F–525—flowage rights, F–564—flowage rights) taken in Civil Action 1073 the sum of $61,815.13 with interest at 6% from July 5, 1950, to the date of the entry of judgment.

In entering judgments for these amounts the Clerk of this Court will allow appropriate credits for any sums paid into Court by the United States in these actions for the Twin City properties.

Under a stipulation in the record payments under these judgments shall be made to William P. Dauchy, Successor-Trustee under the mortgage originally given to the Merchants Trust Company of New York, January 1, 1901 (Ex. 4).

After careful consideration of the exhaustive and well-prepared Report of the Commissioners, their Findings of Fact and Conclusions of Law, the testimony and evidence in the case, the oral and written briefs of attorneys for the parties, it is this Court's opinion that the Report of the Commissioners, their Findings of Fact and Conclusions of Law as herein modified, should be confirmed and adopted by the Court, and

It Is So Ordered.

It Is Further Ordered, That judgments, as provided herein, be entered in Civil Actions 786, 1033 and 1073.