215 F.2d 592
 UNITED STATES of America,
v.
TWIN CITY POWER COMPANY and William P. Dauchy, its
Mortgagee, Appellees.
UNITED STATES of America, Appellant,
v.
TWIN CITY POWER COMPANY and William P. Dauchy, its
Mortgagee, Appellees.
UNITED STATES of America, Appellant,
v.
TWIN CITY POWER COMPANY and William P. Dauchy, its
Mortgagee, Appellees.
 Nos. 6805-6807.
 United States Court of Appeals, Fourth Circuit.
 Argued June 15, 1954.
Decided Aug. 30, 1954.
 
 John F. Cotter, Atty., Dept. of Justice, Washington, D.C. (Perry W. Morton, Asst. Atty. Gen., John C. Williams, U.S. Atty., Greenville, S.C., and Edmund B. Clark, Atty., Dept. of Justice, Washington, D.C., on brief), for appellant.
 David W. Robinson, Columbia, S.C. (Robinson, Robinson & Dreher, Columbia, S.C., on brief), for appellees.
 Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.
 PARKER, Chief Judge.
 
 
 1
 These are appeals by the United States in three condemnation cases from awards of compensation for the taking of lands in connection with the Clark Hill water power and flood control development on the Savannah River. The lands taken had been acquired in South Carolina and Georgia by the Twin City Power Company for the development of a power project at Price's Island in the Savannah River and condemnation cases for their taking were instituted by the United States in the court below and in the United States District Court for the Southern District of Georgia. Motions by the United States to strike portions of the answers which asserted the right of the owner of the lands to have their availability for the development of water power considered in connection with market value raised before the judge below the only question presented by this appeal; and his opinion in entering the order denying the motions deals with the question ably and conclusively. See United States v. 1532.63 Acres of Land, 86 F.Supp. 467.
 
 
 2
 Commissioners to value the lands were appointed by the court below acting in conjunction with the United States District Court for the Southern District of Georgia. United States v. 3928.09 Acres of Land, 12 F.R.D. 127. The commissioners heard evidence on the question of compensation and filed a comprehensive report showing that the lands taken, when considered in connection with their availability for water power purposes, had a value of $267.02 per acre, and valued them accordingly. The commissioners further found that for agricultural purposes or as wild forest land, without reference to availability for development of water power, the lands would have had a value of around $37 per acre. The court below entered judgment for the landowner and its mortgagee in accordance with the valuation of the commissioners, United States v. 3928.09 Acres of Land, D.C., 114 F.Supp. 719; and the United States has appealed.[1] No question is raised on the appeal except with respect to considering the availability of the lands for water power purposes on the question of valuation, the contention of the United States being that 'the value of land as a potential power site on a navigable stream is not an element of just compensation under the Fifth Amendment'. We agree with the judge below that this contention cannot be sustained.
 
 
 3
 There is practically no dispute as to the facts. They are thus stated by the District Judge in his order denying a petition for rehearing:
 
 
 4
 'The properties of the two Twin City corporations taken by the United States in these actions and in those pending in the Southern District of Georgia, extend some eleven miles along both sides of the Savannah River from Price's Island to Chamberlain's Ferry embracing some forty-seven hundred acres. Along this distance the Savannah River has a sixty-foot fall and a stream flow exceeding that at most of the hydro developments in Georgia and the Carolinas. At Price's Island on the Twin City properties there was an excellent dam site between spurs with sound foundation rock and ideal clay available for construction purposes.
 
 
 5
 'Twin City's ownership of a strip of land for a railroad siding to the C. & W. C. Railroad some two miles away, the proximity of nearby transmission facilities, the ownership of a reservoir area free of houses, bridges, railroads and highways were factors materially minimizing construction costs. At the time of taking, conditions were favorable for the marketing of power.
 
 
 6
 'Dams at the Price's Island site were economically feasible for use in connection with a sixty, seventy, eighty, ninety or one hundred foot head. Twin City owned practically all of the land needed for the sixty-foot development and therefore an integrated site for such a project. These properties embraced one of the best undeveloped hydro sites in the eastern part of the United States. This land was also useful for hydro-electric purposes in conjunction with up-stream and down-stream properties owned by others. The value of the Twin City lands would have been increased by up-stream developments at Calhoun Falls and at Hartwell which were under consideration at the time of taking.
 
 
 7
 'These properties were under constant study for hydro-electric development from the time of the first acquisition for this purpose by Twin City in 1901. It was authorized to build dams in the Savannah River under six Acts of Congress enacted between 1901 and 1919. The Secretary of War and the Chief of Engineers approves its plans, the Federal Power Commission tendered Twin City a preliminary permit in 1926, for a development at Price's Island. From 1928 to 1932, the Savannah River Electric Company held a Federal Power license to build at Clark Hill and to incorporate the Twin City properties into its development. From time to time other private interests were interested in acquiring these properties for river development. During the twenty-year period immediately preceding these condemnation proceedings the Army Engineers had this stretch of the Savannah under constant study in connection with both private and public hydro-electric development. Finally in 1944, Congress decided that the project should be built by the United States and the Federal Power Commission therefore refused to issue a license for its construction to the private applicant, the Savannah River Electric Company. Savannah River Electric Co. v. Federal Power Comm., 4 Cir., 164 F.2d 408.
 
 
 8
 'These facts are largely undisputed. The great weight of the evidence supports the finding that this use for power purposes was so probable at the time of taking as to affect the market value of the property. The Government, having been attracted to the acquisition of this property because of its suitability for water power development, can hardly deny that the water power potential actually did affect its value in the market.
 
 
 9
 'The amount of the award is supported by the preponderance of the evidence. Three competent and well qualified hydraulic engineers with large experience in this field, after fully considering all of the pertinent factors, testified that in their respective opinions a prudent, competent and well-informed buyer, willing but not compelled to buy, trading with an equally well-informed, competent and willing seller would have paid substantially more than the award for these properties. The commissioners, evaluating all of the evidence, found that a figure, less than these given in these opinions, was just compensation and the two courts confirmed the aggregate of the awards in the companion decrees of August 26, 1953. On reconsideration I am convinced of the correctness of the findings in the decree.'
 
 
 10
 It is provided by the Fifth Amendment to the Constitution of the United States that private property shall not be taken for public use 'without just compensation'; and in arriving at just compensation all elements entering into the value of the property taken must be given consideration. The most profitable use of the land here being taken is use in the development of water power; and there is no basis in law or in reason why this element of value should be ignored. The land was acquired by the owner for that purpose; and it is now being acquired by the United States for that purpose. As was well said by the District Judge in his opinion, 114 F. Supp. at page 723:
 
 
 11
 'All of the properties of Twin City and the entire eleven mile stretch of the Savannah River along which this land lay have been incorporated by the United States in its Clark Hill hydro development for water power purposes as its best and most valuable use. The testimony from both sides shows that during the entire period from 1901 to the date of taking Congress and all of the interested Federal agencies, without exception or dissent, considered that these properties of Twin City should be developed for water power, either by private interests or by the United States and either separately or in conjunction with other property.'
 
 
 12
 The rule applicable in such a situation is that stated in Olson v. United States, 292 U.S. 246, 255, 256, 54 S.Ct. 704, 708, 709, 78 L.Ed. 1236, as follows:
 
 
 13
 'The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. Mississippi & R. R. Boom Co. v. Patterson (8 Otto 403), 98 U.S. 403, 408, 25 L.Ed. 206; Clark's Ferry Bridge Co. v. Public Service Comm., 291 U.S. 227, 54 S.Ct. 427, 78 L.Ed. 767; 2 Lewis, Eminent Domain, 3d Ed. Sec. 707, p. 1233; 1 Nichols, Eminent Domain, 2d Ed. Sec. 220, p. 671. The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may be or is being acquired by eminent domain negative consideration of availability for use in the public service. (City of) New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143. It is common knowledge that public service corporations and others having that power frequently are actual or potential competitors not only for tracts held in single ownership but also for rights of way, locations, sites and other areas requiring the union of numerous parcels held by different owners. And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account. Boom Co. v. Patterson, ubi supra.'
 
 
 14
 See also Mississippi & R. R. Boom Co. v. Patterson, 8 Otto 403, 98 U.S. 403, 407-408, 25 L.Ed. 206; City of New York v. Sage, 239 U.S. 57, 36 S.Ct. 25, 60 L.Ed. 143; McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205; United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; Grand River Dam v. Grand-Hydro, 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64; United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390. When the case last cited was before this court on remand from the Supreme Court, we went carefully into the rule applicable in a case of this sort and laid down what we understand to be the proper rule in the following language, 138 F.2d 343 at pages 345-346:
 
 
 15
 'Certainly one who has embarked upon the enterprise of a great water power development, has purchased and brought together thousands of acres of land for the purpose and spent hundreds of thousands of dollars in the enterprise, is entitled to have his holdings valued on some other basis than that of numerous small separated tracts of wild mountain land, if it be found, irrespective of the possession of the power of eminent domain by the landowner, that 'there is a reasonable probability of the lands in question being combined with other tracts into a power project in the reasonably near future'. Market value is nothing but a hypothetical concept based upon what, in the opinion of those who know, a willing buyer would have to pay a willing seller of property in order to purchase it. The question here is, not what wild mountain land was selling for in the community, but what would the portion of land owned by Powelson and available for this water power development have been reasonably worth on the market when sold by one who was willing but not compelled to sell and bought by one who was willing but not compelled to buy.'
 
 
 16
 And we do not think that, because the availability of the land for water power purposes arises from the fact that it is appurtenant to a navigable stream, such availability should be ignored in appraising value for purposes of condemnation. What is being taken is, not the flow of the stream or the bed of the stream, but adjoining land which is being taken to form the basin of a reservoir; and, if its present availability for such use adds to its market value, there is no reason why this must not be taken into consideration in determining the compensation to be paid the owner, if just compensation is to be accorded him as required by the Constitution. We recognize, of course, that under the power to regulate interstate commerce the government has a servitude with respect to the bed of a navigable stream and the flow of water therein and may remove any obstruction to navigation without being liable in damages therefor, United States v. Chicago, M., St. P. & P.R. Co., 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064; but that is not what the government is doing here. It is taking, not the bed of the stream, but lands adjacent to the stream and is taking them, not for purposes of navigation, but for the primary purposes of flood control and the development of water power.[2] Cf. United States v. Gerlach Live Stock Co., 339 U.S. 725, 739-742, 70 S.Ct. 955, 94 L.Ed. 1231.
 
 
 17
 It is well settled that the 'right of the United States in the navigable waters within the several states is limited to the control thereof for purposes of navigation', Port of Seattle v. Oregon & W. R. Co., 225 U.S. 56, 63, 41 S.Ct. 237, 239, 65 L.Ed. 500; and that, as to fast land, 'The absolute ownership and right of private property in such land is not varied by the fact that it borders on a navigable stream'. Pumpelly v. Green Bay Co., 13 Wall. 166, 182, 20 L.Ed. 557. Consequently, even where improvement of navigation is the purpose, any taking outside the bed of the stream of adjacent 'fast' lands must be compensated for as in any other taking of private property. United States v. Chandler-Dunbar Co.,229 U.S. 53, 60, 65, 33 S.Ct. 667, 57 L.Ed. 1063. This would seem to be elementary since the limitations of the Fifth Amendment apply to the government when exercising the commerce power as well as other powers. Certainly, it is absurd to contend that, because the government is given control of navigation in the river and may exercise the servitude incident to such control, it may build a dam for water power purposes and take lands of private owners to form a basin for the reservoir thus created without paying the reasonable value of the land so taken. As said by Mr. Justice Brewer in Monongahela Navigation Co. v. United States, 148 U.S. 312, 337, 338, 13 S.Ct. 622, 631, 37 L.Ed. 463:
 
 
 18
 'It would seem strange that if, by asserting its right to take the property, the government could strip it largely of its value * * *. In other words, by the contention this element of value exists before and after the taking, and disappears only during the very moment and process of taking. Surely, reasoning which leads to such a result must have some vice, at least the vice of injustice.'
 
 
 19
 Very much in point is the case of United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277, wherein the construction of a dam on the Mississippi River, purely in aid of navigation, caused the raising of the river continuously to high water level and, as the result of underflowing caused thereby, destroyed the value of adjacent lands for agricultural purposes. The court held that the United States in the exercise of the power to regulate commerce could not take lands beyond the bed of the stream without liability therefor, and that the underflowing of the riparian lands involved constituted a taking for which compensation must be paid. In distinguishing the case of United States v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 101, and other cases holding that there was no liability for exercise of power relating solely to the bed of the stream, the court, speaking through Justice Burton, said 339 U.S. at page 808, 70 S.Ct., at page 890:
 
 
 20
 'It is not the broad constitutional power to regulate commerce, but rather the servitude derived from that power and narrower in scope, that frees the Government from liability in these cases. When the Government exercises this servitude, it is exercising its paramount power in the interest of navigation, rather than taking the private property of anyone. The owner's use of property riparian to a navigable stream long has been limited by the right of the public to use the stream in the interest of navigation. See Gould on Waters, c. IV, Secs. 86-90 (1883); I Farnham, Waters and Water Rights, c. III, Sec. 29 (1904). This has applied to the stream and to the land submerged by the stream. There thus has been ample notice over the years that such property is subject to a dominant public interest. This right of the public has crystallized in terms of a servitude over the bed of the stream. The relevance of the high-water level of the navigable stream is that it marks its bed. Accordingly, it is consistent with the history and reason of the rule to deny compensation where the claimant's private title is burdened with this servitude but to award compensation where his title is not so burdened.' (Italics supplied).
 
 
 21
 The court appended the following note to the last sentence of the above quotation:
 
 
 22
 'This is clearly illustrated in United States v. Chicago, M., St. P. & P.R. Co., supra, (312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064). The United States raised the level of the navigable river above its ordinary high-water mark. This Court then declined to allow compensation for the damage coused to the segment of the respondent's embankment which concededly was located on land within the bed of the river. On the other hand, the lower court awarded compensation for the damage done to such segments of the embankment as concededly were on land above the bed of the river. No appeal was taken from that award. Finally as to three other segments with regard to which there was a disagreement as to whether or not they were on land within the bed of the river, this Court remanded the case to the District Court to resolve that factual issue.'
 
 
 23
 It is argued that the adjacent owner does not own the water power value of the current of the river. This is true; but it is also true that the government does not own or have any servitude over the adjacent fast lands. A power development can no more be constructed without the one than without the other; and just as the adjacent owner may not take the current of the stream for his own uses from the government representing the public, so the government may not take his lands from him without making just compensation, which, as we have seen, includes every element which would properly be considered in determining market value. Value with respect to the water power of a river does not reside solely in the flow of the stream. Such flow would not create water power without the damming of the stream and the creation of a reservoir; and the reservoir could not be created without the taking of adjacent lands as a basin for it. It is because of the availability of adjacent lands for this purpose that they acquire value that they would not otherwise have; and such value may no more be ignored in fixing just compensation than may any other element entering into the determination of what a willing purchaser would have to pay a willing seller in order to acquire the lands.
 
 
 24
 There is nothing to the contrary in United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; but that decision, we think, when properly interpreted supports our conclusion. It was there held that the United States could not be required to pay compensation for requiring the removal from navigable waters of a dam which was an obstruction to navigation nor for resulting decrease in the value of a factory site on fast lands adjacent thereto; but it was held also that in valuing these fast lands account might be taken of their availability for lock and canal purposes. In overruling the exception of the government to an award of damages based upon availability for such purposes the court said, 229 U.S. at pages 76-77, 33 S.Ct. at page 677:
 
 
 25
 'The exception taken to the inclusion as an element of value of the availability of these parcels of land for lock and canal purposes must be overruled. That this land had a prospective value for the purpose of constructing a canal and lock parallel with those in use had passed beyond the region of the purely conjectural or speculative. That one or more additional parallel canals and locks would be needed to meet the increasing demands of lake traffic was an immediate probability. This land was the only land available for the purpose. It included all the land between the canals in use and the bank of the river. Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, it is proper to consider the fact that the property is so situated that it will probably be desired and available for such a purpose. Lewis, Em. Dom. Sec. 707; Mississippi & R. River Boom Co. v. Patterson, 8 Otto 403, 98 U.S. 403, 408, 25 L.Ed. 206, 208; * * *.'
 
 
 26
 The case of United States v. Willow River Power Company, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 101, which is relied on by the United States, involved, not the taking of shore land for power purposes, but the reduction in the generating capacity of a plant resulting from an authorized navigation improvement. See United States v. Kansas City Life Ins. Co., 339 U.S. 799, 805-808, 70 S.Ct. 885, 94 L.Ed. 1277. In Continental Land Co. v. United States, 9 Cir., 88 F.2d 104 and Washington Water Power Co. v. United States, 9 Cir., 135 F.2d 541, it appeared that there was no reasonable probability of the utilization of the lands for water power by private capital in the reasonably near future. Precisely the opposite is the case here, where the evidence shows that, but for the government's undertaking the construction at Clark Hill, the lands here would have been acquired by the Savannah River Electric Company for power purposes.[3] In so far as the two cases last cited may be construed as holding that, because a riparian owner of lands on a navigable stream has no property right in the bed or flow of the stream against the United States, he may not recover for the power site value of the lands, even though there is a present probability of their use for power purposes which has added to their market value, we think that this is contrary to what is clearly held by the Supreme Court in cases heretofore cited.
 
 
 27
 We are not impressed by the argument that availability for water power development may not be considered in awarding compensation because under the Federal Water Power Act, 16 U.S.C.A. § 791a et seq., a development can be constructed in the river only under permit from the Federal Power Commission. As the Supreme Court pointed out in the recent case of Federal Power Commission v. Niagara Mohawk Power Corp., 347 U.S. 239, 74 S.Ct. 487, 494, private proprietary rights existing under state law have not been abolished by the Federal Water Power Act. In that case the court said:
 
 
 28
 'The Act treats usufructuary water rights like other property rights. While leaving the way open for the exercise of the federal servitude and of federal rights of purchase or condemnation, there is no purpose expressed to seize, abolish or eliminate water rights without compensation merely by force of the Act itself.'
 
 
 29
 In Ford & Son v. Little Falls Co., 280 U.S. 369, 377, 378, 50 S.Ct. 140, 141, 74 L.Ed. 483, 8t was held that the act did not preclude the recovery of damages for the impairment of a water power as the result of the backing of water by a down stream development which the Federal Power Commission had licensed under the act. The court, speaking through Mr. Justice (later Chief Justice) Stone, said:
 
 
 30
 'Whether the Commission acted within or without its jurisdiction in granting the license, and even though the rights which the respondents here assert be deemed subordinate to the power of the national government to control navigation, the present legislation does not purport to authorize a licensee of the Commission to impair such rights recognized by state law without compensation. Even though not immune from such destruction they are, nevertheless, an appropriate subject for legislative protection. See United States v. Realty Co., 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215; Guthrie National Bank v. City of Guthrie, 173 U.S. 528, 535, 19 S.Ct. 513, 43 L.Ed. 796; Joslin Mfg. Co. v. City of Providence, 262 U.S. 688, 675, 676, 43 S.Ct. 684, 67 L.Ed. 1167; Otis Co. v. Ludlow Mfg. Co., 201 U.S. 140, 152, 26 S.Ct. 353, 50 L.Ed. 696; Oswego & Syracuse R. R. Co. v. State, 226 N.Y. 351, 356, 124 N.E. 8. Especially is there reason for such protection where, as here, their sacrifice may be involved in the grant of a valuable privilege to a licensee. We think that the provisions of the act are quite sufficient in themselves to save respondents from any such appropriation of their water power.'
 
 
 31
 See also Grand River Dam v. Grand-Hydro, supra, 335 U.S. 359, 372, 69 S.Ct. 114.
 
 
 32
 Some confusion in thinking seems to have arisen because the building of the dam at Clark Hill was unquestionably within the power of the government and necessarily precludes the building of a dam at Price's Island. The answer is that the lands of plaintiff have value for water power purposes because they furnish a portion of the basin of a reservoir needed for the development of water power, and that this is true whether the dam creating the reservoir be located at Price's Island or at Clark Hill. There is nothing to show and no reason to think that their market value is any less because they can be used in connection with the development at Clark Hill than if they had been available for use only in connection with a development at Price's Island. There can be no question but that, if the Savannah River Electric Company had been allowed to construct the Clark Hill project, it would have had to compensate Twin City for the Price's Island property on the basis of the manifest value of that property for water power purpose. When the government takes over the project, there is no reason in law, in justice or in common honesty why it should not pay compensation on the same basis. As said by Mr. Justice Brewer in the passage above quoted from the Monongahela Navigation case, reasoning which leads to any other result 'must have some vice, at least the vice of injustice'; and injustice in determining compensation to be paid for property taken violates the requirement of the Fifth Amendment that the compensation be just.
 
 
 33
 Affirmed.
 
 
 
 [1]
 The United States has filed notices of appeal to the Court of Appeals of the Fifth Circuit from like judgments entered in the United States District Court for the Southern District of Georgia
 
 
 [2]
 That the purposes of the taking was not improvement of navigation but flood control and water power development see statement of facts by this court in the Clark Hill case, Savannah River Elec. Co. v. Federal Power Commission, 4 Cir., 164 F.2d 408
 
 
 [3]
 See Savannah River Electric Co. v. Federal Power Commission, supra, 4 Cir., 164 F.2d 408