The **CONFEDERATED TRIBES OF THE COLVILLE RESERVATION,** et al., Plaintiffs,

v.

The **UNITED STATES, Defendant.**

No. 181–D.

United States Claims Court.

March 23, 1990.

Abe Weissbrodt, Washington, D.C., attorney of record, for plaintiffs.

Edward J. Passarelli, Washington, D.C., with whom was Asst. Atty. Gen. Richard B. Stewart, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

The Confederated Tribes [1] of the Colville Reservation (plaintiffs or the Tribes) seek compensation for the water power values of certain tribal lands taken and used by the United States (defendant) in the construction of the Grand Coulee Dam and the Franklin D. Roosevelt Reservoir on the Columbia River in the State of Washington. The amended petition, the last in a series of claims commenced on July 31, 1951, is filed pursuant to the authority of the Indian Claims Commission Act (ICCA) of 1946, Pub.L. No. 79–726, § 2, 60 Stat. 1049, 1050, *formerly codified at* 25 U.S.C. § 70a.[2]

The defendant filed a motion for partial summary judgment on November 13, 1984. Stated simply, it argues that the Tribes are precluded from recovering any compensation because Congress allegedly exercised its constitutional powers to promote and aid navigation for the public good. It is asserted that this proper exercise of the "navigational servitude" legally forecloses any attempt by the Tribes to recover compensation for water power values stemming from the flow of the Columbia River. Defendant further avers that it has not assumed or breached any trust relationship, special or otherwise, when it took certain tribal lands to build the project.

The Tribes responded to the foregoing with a cross-motion for partial summary judgment, filed on January 14, 1985. Therein they argue that, even if the navigational servitude was properly exercised by the defendant, it is subordinate to claims initiated under the extra-legal grounds of recovery provided by clauses (3), (4), and (5) in § 2 of the ICCA. Plaintiffs further contend that they are entitled to recover, pursuant to legal principles under which the defendant supposedly undertook an obligation to secure water power values of tribal trust lands, notwithstanding any exercise of the navigational servitude. As an *alternative* basis for their motion, the Tribes deny that Congress in fact exercised the navigational servitude. Rather, the plaintiffs aver that the project was contemplated for reclamation purposes *only*, and was not intended to further navigational objectives.

Following oral argument on March 5, 1990, and for the reasons stated herein, we

---

1. The Confederated Tribes of the Colville Reservation include the Colville, Lake, Sanpoil–Nespelem, Okanogan, Methow, Columbia, Wenatchee, Chelan, Entiat, Palus, and Joseph's Band of the Nez Perce Indians.

2. The ICCA of 1946, Pub.L. No. 79–726, § 2, 60 Stat. 1049, 1050, *formerly codified at* 25 U.S.C. § 70a, provided in part:

   **§ 70a. Jurisdiction; claims considered; offsets and counterclaims**

   The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity ... with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. No claim accruing after August 13, 1946, shall be considered by the Commission....

   The Commission was dissolved by the Act of October 8, 1976, Pub.L. 94–465, § 2, 90 Stat. 1990, *formerly codified at* 25 U.S.C. § 70v. Pursuant to that Act, all pending suits were transferred to the United States Court of Claims. The United States Claims Court subsequently obtained jurisdiction over this matter under the Federal Courts Improvement Act of April 2, 1982, Pub.L. 97–164, Title I, § 149, 96 Stat. 25, 46.

hold that Congress intended to create a *multiple-purpose project* with navigational benefits when it authorized the Grand Coulee Dam. Further, we hold that this full and proper assertion of the "navigational servitude" is superior to all the Indian claims presented in this case for partial summary judgment. Consequently, the plaintiffs' motion is DENIED, and the defendant's motion for partial summary judgment is GRANTED on the issue of liability. Having exonerated the defendant from liability to pay any compensation, the subject petition is DISMISSED.

*Facts*

An abbreviated historical background on the Tribes and the genesis of the Colville Reservation is helpful in this case. It is undisputed that the reservation was carved out of an extensive region in the Pacific Northwest that included the ancestral lands of a number of Indian bands that would later become members of the Confederated Tribes. The United States acquired title to the region, which was the aboriginal domain of the Colville, Lake, Sanpoil–Nespelem, and Okanogan tribes, by a Treaty with Great Britain on June 15, 1846, 9 Stat. 869.[3] The Colville Reservation was later created by the Executive Order of President Ulysses S. Grant on July 2, 1872.[4] The boundaries of the 3,000,000 acre reservation were described as being "bounded on the east and south by the Columbia River, on the west by the Okanogan River, and on the North by the British possessions." 1 C. Kappler, Indian Affairs, Laws, and Treaties 916 (2 ed. 1904).[5]

The subject matter of this dispute in issue arose when the United States decided to construct the Grand Coulee Dam[6] on the Columbia River adjacent to the reservation. The Dam was initiated as a public works

3. These ancestral Indian lands thereafter became part of the Territory of Oregon pursuant to the Act of August 14, 1848, 9 Stat. 323. By the Act of March 2, 1853, 10 Stat. 172, Congress established the new Territory of Washington, which encompassed the aforementioned Indian lands. By the Act of July 31, 1854, 10 Stat. 315, Congress appropriated funds whereby it sought to extinguish the aboriginal title held by the Indian tribes located in Washington Territory through the negotiation of a treaty. However, neither the Colville, Lake, Sanpoil–Nespelem, nor Okanogan signed a treaty agreeing to cede their ancestral lands to the United States. Instead, the United States subsequently created the subject reservation to which these and other Indians were confined after 1872.

4. The Colville Reservation was originally set aside for certain named Indian tribes—the Colville, Lake, Sanpoil–Nespelem, Okanogan, Calispel, Spokane, Coeur d'Alene, and Methow. The Calispel, Spokane, and Coeur d'Alene tribes were moved to other reservations. The Columbia, Wenatchee, Chelan, Entiat, Palus, and Joseph's Band of the Nez Perce were not named as tribes for whom the reservation was established, nor was the reservation comprised of any ancestral lands previously occupied by any of these tribes. They were, however, located on the Colville Reservation under the authority of language in the Executive Order of July 2, 1872, which provided "for such other Indians as the Department of the Interior may see fit to locate thereon."

5. The Tribes ceded 1,500,000 acres in what was then the northern half of the 3,000,000 acre reservation by an Agreement signed on May 9, 1891, and a series of subsequent legislation designed to effectuate that Agreement. Thus, the northern half of the reservation was restored to the public domain by the Act of July 1, 1892, 27 Stat. 62, and opened to entry and settlement by an April 10, 1900 proclamation of the President, 31 Stat.1963. For a discussion of the process, *see Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1974). Certain lands in the southern half were placed in the public domain by the Act of March 22, 1906, 34 Stat. 80, and opened to entry and settlement by a Presidential proclamation issued May 3, 1916, 39 Stat. 1778. These lands were later closed by a Secretarial order in 1934, and restored to tribal ownership by the Act of July 24, 1956, 70 Stat. 626. For a consideration of the status of bands in the southern half of the reservation, *see Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).

6. The Grand Coulee Dam site is located in section 1, township 28 north, range 30 east, Willamette meridian. It is 75 miles west of the city of Spokane, Washington, and 75 miles northeast of the city of Wenatchee. By river, the site is 151 miles from the international boundary, 109 miles below the site known as Kettle Falls, 53 miles above Foster Creek, and 274 miles above the mouth of the Snake River. At the point where the Grand Coulee Dam was constructed, the Columbia River flowed due north through a canyon approximately 1,000 feet deep, 2,000 feet wide at the bottom and one mile at the top. Army Corps of Engineers Report, *Columbia River and its Minor Tributaries*, H.R.Doc. No. 103, 73d Cong., 1st Sess., vol. II, p. 726 (1932).

project pursuant to the National Industrial Recovery Act of 1933, Pub.L. No. 73–67, Title II, §§ 201–207, 48 Stat. 195, 200–205, *formerly codified at* 40 U.S.C. §§ 401–403. Subsequently, in the Rivers and Harbors Act of August 30, 1935, Pub.L. No. 74–409, § 2, 49 Stat. 1028, 1039, 1040, Congress specifically authorized and adopted the Grand Coulee Dam project. Funds for the project were initially appropriated by Congress in the Act of June 22, 1936, Pub.L. No. 74–741, 49 Stat. 1757, 1784. The Dam, after a series of Acts appropriating additional funds for the continuation and eventual completion of the project,[7] began to generate hydroelectric power in 1941 and was completed in 1942.[8]

Congress did not, however, authorize the taking of any Indian lands within the Colville Reservation for almost seven years, at which time the Dam was nearing completion.[9] By the Act of June 29, 1940, Pub.L. No. 76–690, 54 Stat. 703, 704, *codified as amended* 16 U.S.C. §§ 835d–835h, Congress authorized the Secretary of the Interior to designate and acquire tribal lands within the Colville Reservation in aid of the construction of the Grand Coulee Dam. It further provided that no lands could be taken for reservoir purposes above the ele-

vation of 1,310 feet above sea level.[10] The defendant thereafter acquired certain tribal lands upon designation of the interest to be taken by the Secretary of the Interior. As for the amount of compensation, § 2 of the Act, *codified as amended at* 16 U.S.C. § 835e, stated: "As lands or interests are designated from time to time under sections 835d to 835h of this title, the Secretary of the Interior shall determine the amount of money to be paid to the Indians as *just and equitable compensation* therefor." (emphasis added). More than 3,000 acres of tribal "fast" lands [11] located in the southern half of the Colville Reservation were designated for acquisition by the Secretary of the Interior pursuant to § 1 of the Act of June 29, 1940, *codified as amended at* 16 U.S.C. § 835d. After these tribal lands were taken, they were appraised, and ordinary compensation was paid by the Department of the Interior in accordance with the provisions of § 2 of the Act of June 29, 1940, *codified as amended at* 16 U.S.C. § 835e. The appraisals and subsequent compensatory payments did not consider any power or water-related values. Moreover, the defendant did not designate for acquisition and appraisal any riverbed lands under the Columbia River.

---

7. *See* 50 Stat. 564, 597; 52 Stat. 291, 324; 54 Stat. 82, 87; 54 Stat. 406, 438; 56 Stat. 506, 536.

8. The Grand Coulee Dam was at that time the largest concrete dam, measuring 550 feet from bedrock to crest. It is 450 feet thick at its base, 30 feet thick at its top, and 4,173 feet long. It backs up water for 151 miles, forming Franklin D. Roosevelt Lake, which has a shoreline of more than 600 miles. Walker, *The Economic Significance of Columbia Basin Project Development*, Bulletin 669, p. 10 (Sept. 1966).

9. The Columbia River forms the entire eastern boundary of the Colville Reservation, until it reaches the mouth of the Spokane River; the Columbia also forms the southern boundary of the reservation, until it reaches the mouth of the Okanogan River.

10. Prior to the amendment of December 16, 1944, Pub.L. No. 78–497, 58 Stat. 813, 814, *codified at* 16 U.S.C. §§ 835d–835h, the Act of June 29, 1940, Pub.L. No. 76–690, § 1, 54 Stat. 703, provided in part:

> Be it enacted by the Senate and House of Representatives of the United States of Amer-

ica in Congress assembled, That, in aid of the construction of the Grand Coulee Dam project, authorized by the Act of August 30, 1935, (49 Stat. 1028) there is hereby granted to the United States, subject to the provisions of this Act, (a) all the right, title, and interest of the Indians in and to the tribal and allotted lands within the Spokane and Colville Reservations ... as may be designated by the Secretary of the Interior from time to time: Provided, That no lands shall be taken for resorvoir [sic] purposes above the elevation of one thousand three hundred and ten feet above sea level ... and (b) such other interests in or to any of such lands and property within these reservations as may be required and as may be designated by the Secretary of the Interior from time to time for the construction of pipelines, highways, railroads, telegraph, telephone, and electric-transmission lines in connection with the project, or for the relocation of such facilities made necessary by the construction of the project....

11. "Fast" lands are those lands located above the ordinary high water mark of the Columbia River.

*Contentions of the Parties*

By their petition under § 2 of the ICCA, *formerly codified at* 25 U.S.C. § 70a, the plaintiffs seek to recover "just and equitable" compensation for the water power values of certain riverbed and upstream lands taken by the defendant in aid of the Grand Coulee Dam project. The plaintiffs advance two claims as a basis for remuneration. Stated simply, the Tribes aver that the defendant failed to pay compensation for the hydroelectric power generated by the flow of the Columbia River over tribal lands taken in aid of the Grand Coulee Dam. First, the Tribes assert equitable title in certain riverbed lands upon which the Grand Coulee Dam was built. As such, they contend that they are entitled to restitution for water power and ordinary values attached to those riverbed lands, which were taken without the payment of any compensation whatsoever. Second, it is alleged that the Tribes received wholly inadequate compensation for the 3,000 acres of upstream tribal fast lands inundated by the backed-up waters of what is now the Franklin D. Roosevelt Reservoir, in that they were not paid for water power values attributable to those lands.

A. *Defendant*

In response to the petition, the defendant filed a motion for partial summary judgment on the issue of liability. Therein it asserts that Congress intended to create a multiple-purpose project with navigational benefits for the Columbia River when it contemplated the construction of the Grand Coulee Dam and Franklin D. Roosevelt Reservoir. Thus, the defendant argues that Congress asserted the sovereign's constitutional power to exercise the "navigational servitude." The defendant vigorously contends that this well-established principle permits the government to take both the riverbed and the fast lands in question here without the payment of any compensation for a claim based on water power

values. In other words, in the defendant's view, the recovery sought by the Tribes is precluded in its entirety by the operation of the navigational servitude, a dominant constitutional power stemming from the Commerce Clause. In support of this argument it is averred that—the Columbia River was and is a navigable waterway subject to the navigational servitude in this project; Congress intended to exercise the navigational servitude; and the application of the navigational servitude to any tribal interests [12] taken to aid in the construction of the Grand Coulee Dam and Franklin D. Roosevelt Reservoir was entirely proper and within constitutional limitations.

Moreover, according to the defendant, its exercise of the navigational servitude is not subject to or affected by any trust relationship asserted by the Tribes. In this context, the defendant emphasizes, first and foremost, that the power to exercise the navigational servitude is derived from constitutional powers under the Commerce Clause. Consequently, it contends all tribal interests are subordinate to the legitimate and proper exercise of this constitutional power like any other individual or entity.

The defendant further contests the Tribes' ability to succeed on any claim premised on § 2 of the ICCA. In particular, the defendant avers that the Tribes have no right to recover under the extra-legal remedies allegedly provided in the fair and honorable dealings clause in § 2 of the ICCA, *formerly codified at* 25 U.S.C. § 70a(5). It argues that any fair and honorable dealings claim must be based upon some type of special obligation undertaken pursuant to a treaty, agreement, order, or statute *expressly* obligating the government to confer benefits or perform services. Asserting that no special obligation was undertaken to compensate the Tribes for the sovereign's constitutional right to assert the navigational servitude, and con-

---

**12.** The defendant adamantly disputes any and all riverbed ownership claims by the Tribes, but argues that, even if equitable title to the riverbed was vested in the Tribes, the application of the navigational servitude would still preempt the right to any compensation. Therefore, the defendant concedes, for the purposes of its motion, that this factual issue is not material.

tending that none has been established by the Tribes, the defendant concomitantly concludes that it has no obligation to compensate the Tribes under any provision of the ICCA. It is the defendant's view, moreover, that the Tribes have not established any basis whatsoever sufficient to circumvent the operation of the dominant navigational servitude.

### B. *Plaintiffs*

Instead of merely opposing the defendant's motion, the plaintiffs have responded with their own motion for partial summary judgment on the issue of liability. To rebut the defendant's assertion of the navigational servitude, the Tribes emphatically contend that the congressional intent in commencing the Grand Coulee Dam project was undertaken for "reclamation" purposes *only*, such as irrigation and hydroelectric power generation. In the plaintiffs' view, Congress did not intend to aid navigation in any *real* manner when it initiated the project. Consequently, the plaintiffs argue that the lack of any real congressional intent to aid navigation prohibits a viable defense based upon the sovereign's power to exercise the navigational servitude, since that principle is inapplicable to projects undertaken for reclamation purposes alone. In support of this proposition, the Tribes rely heavily on *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950).

The Tribes also present an alternative argument as a basis for their partial summary judgment, which they suggest is the primary issue in this case. For the purpose of this argument only they concede the existence and the proper exercise of the navigational servitude, but contend nevertheless that it is subordinate to an Indian claim founded on clauses (3), (4), and (5) in § 2 of the ICCA. Citing *Otoe and Missouria Tribe of Indians v. United States*, 131 Ct.Cl. 593, 131 F.Supp. 265 (1955), *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955), they aver that clauses (3), (4), and (5) in § 2 of the ICCA establish extralegal grounds for recovery founded on principles of honor, fairness, and morality not cognizable in conventional law or equity.

Accordingly, they assert that, when coupled with rights granted in the legislation by which their lands were taken, they are entitled to recover under these extraordinary principles. In other words, the argument goes, when Congress passed the Act of June 29, 1940, Pub.L. No. 76–690, § 2, 54 Stat. 703, *codified as amended at* 16 U.S.C. § 835e, requiring the payment of "just and *equitable* compensation" (emphasis added), it authorized the Tribes to recover compensation under those extra-legal principles allegedly provided by ICCA § 2, clauses (3), (4), and (5). The Tribes cite and rely upon the case of *Burkhardt v. United States*, 113 Ct.Cl. 658, 84 F.Supp. 553 (1949), for the proposition that the extra-legal remedies under § 2 of the ICCA are applicable to the present case, thereby permitting recovery of compensation for water power values without reference to the defendant's alleged exercise of the navigational servitude.

While the plaintiffs believe that they are entitled to recover under these extra-legal principles in and of themselves, they also aver that the requested relief is authorized under conventional legal principles. As an alternative argument, therefore, the Tribes assert that the navigational servitude is no defense because the defendant, as trustee over the tribal lands in issue, has a fiduciary obligation to manage the property for the exclusive benefit of the Tribes and to obtain full compensation upon any disposition of that property, including the water-related value of the tribal lands taken in aid of the construction of the Grand Coulee Dam project. If the defendant were permitted to exercise the navigational servitude, and thereby avoid any obligation to pay compensation, such a circumstance would, in the Tribe's view, be self-dealing and amount to a violation of its fiduciary obligations.

The Tribes also allege that the defendant assumed a special obligation to secure the power-related water values of the tribal lands taken in aid of the Grand Coulee Dam, thereby subordinating its ability to assert the navigational servitude as an affirmative defense. The Tribes cite several

facts which allegedly constitute the averred special obligation. First, they rely on the facts surrounding the creation of the present reservation, particularly the fact that it was carved out of an area to which several of the Tribes had held aboriginal title prior to 1872. Second, they point to a Supreme Court decision in *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914), in which Congress allegedly confirmed and recognized title to the lands within the diminished reservation, including title to the riverbed and upstream lands in dispute here. Third, the Tribes cite a congressional policy which is supposedly intended to secure the benefits of the development of water power on Indian reservations for the affected Indians.[13]

Finally, and most important for the purposes of this theory, the plaintiffs cite the Act of June 25, 1910, Pub.L. No. 61–313, § 13, 36 Stat. 855, 858, *formerly codified at* 43 U.S.C. § 148, which authorized the Secretary of the Interior to reserve from entry any Indian reservation lands that might be useful for power or reservoir sites. In addition, they cite § 14 of that same Act, Pub.L. No. 61–313, 36 Stat. 855, 859, *codified at* 25 U.S.C. § 352, which authorized the Secretary of the Interior to cancel trust patents issued to individual Indians for lands on those sites. It is under these circumstances that the defendant assumed a special obligation to secure power-related water values for the tribal trust lands taken in aid of the project. This interpretation of the circumstances is allegedly supported by *Confederated Salish and Kootenai Tribes v. United States*, 181 Ct.Cl. 739 (1967), and *United States v. 5,677.94 Acres*, 162 F.Supp. 108 (D.Mont.

1958), which, according to the plaintiffs, establish the right to obtain compensation in conformity with the special obligations allegedly undertaken by the defendant here. This right to recovery is also premised on the Tribes' belief that such a claim is superior to the defendant's assertion of the navigational servitude.

*Standard of Review*

The standard by which we must decide these cross-motions is set out in RUSCC 56(c): "The judgment sought shall be rendered forthwith if ... there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law. A summary judgment, interlocutory in character, may be granted on the issue of liability alone although there is a genuine issue as to the amount of damages." The summary judgment standard has been construed by the Supreme Court in several relatively recent decisions. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Sweats Fashions, Inc. v. Pannill Knitting*, 833 F.2d 1560 (Fed.Cir.1987). Summarizing the relevant guideposts, these cases establish that the moving party bears the onerous burden of proving that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law, while the evidence and all factual inferences must be viewed in a light most favorable to the party opposing the motion. As a general matter, these same standards are equally applicable to motions for *partial* summary judgment.[14]

---

**13.** The Tribes cite *Federal Power Commission v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 666 (1954), and various sections of the Federal Power Act. In doing so, however, they apparently argue by analogy only as they concede that these principles are not applicable to federal projects undertaken by the United States, such as the Grand Coulee project. Thus, we do not seriously consider this issue here as there is no reason to believe that Congress intended different principles to apply to this project.

**14.** There are exceptions, however, in partial summary judgment motions. For example,

summary judgment may not be appropriate in matters involving complex issues of Indian land law. *See generally, Arenas v. United States*, 322 U.S. 419, 434, 64 S.Ct. 1090, 1096, 88 L.Ed. 1363 (1944) (a trial court discharges its duty best "in a case of this complexity only by trial, findings, and judgment in regular course"). Additionally, partial summary judgment is not a mandatory requirement, even if, *arguendo*, the moving party is correct in its contentions stating that there are no genuine issues of material fact. In complex cases where partial summary judgment is sought, "[a] court in its discretion, in shaping the case for trial, may deny summary judgment

*Discussion*

At the outset we again note that the Tribes have postured their motion for summary judgment on alternative grounds. First they assert that the Grand Coulee Dam project was commenced for reclamation purposes only, which would thereby preclude any attempted exercise of the affirmative defense of navigational servitude by the defendant. Taking the flip side of the coin on this issue, the defendant argues that the project was for multiple purposes, one of which was to aid navigation. This navigational purpose is an alleged exercise of the navigational servitude, which, according to the defendant, forecloses any requirement to pay compensation to the Tribes for water power values. Second, the Tribes, conceding the existence and proper exercise of the navigational servitude for purposes of the alternative argument only, contend that the servitude is not a viable defense under the circumstances present here. The defendant, of course, avers that when the sovereign exercises the navigational servitude it is asserting a paramount constitutional power superior to any claim by the plaintiffs under any theory. In this context, there are two issues in need of resolution:

(i) Did Congress commence the Grand Coulee Dam with the intent of creating a multiple-purpose project with navigational benefits, thereby exercising the navigational servitude, *or* did it intend to promote reclamation purposes *only*, thereby precluding the defense of the navigational servitude?

(ii) If Congress intended to exercise the navigational servitude by its inclusion of navigational benefits, does the as-

sertion of the servitude bar *any* claim for water-related value compensation under all of the theories advanced by the Tribes, particularly those claims founded on clauses (3), (4), and (5) in § 2 of the ICCA?

A. *Background: The Congressional Power to Regulate Navigation and Exercise the Navigational Servitude*

Before deciding these issues, a brief discussion of the principles relating to congressional powers over navigation and its exercise of the navigational servitude is appropriate. It has long been settled, and the parties here agree, that Congress has exclusive authority over the country's navigable waters [15] under the Commerce Clause. U.S. Const. Art. I, § 8, cl. 3.

> Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all of the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress.

*Gilman v. Philadelphia,* 3 Wall. 713, 724–725, 18 L.Ed. 96 (1886), *cited in Kaiser Aetna v. United States,* 444 U.S. 164, 174, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979).

The power to regulate navigation, and to undertake projects in aid of navigational purposes is pervasive:

> [I]t cannot properly be said that the constitutional power of the United States over its waters is limited to control over navigation.... In truth *the authority*

---

as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation." 6 J. Moore, *Federal Practice,* ¶ 56.15[6], at 2427. This is particularly true in fact-intensive takings jurisprudence seeking just compensation. *See Yuba Goldfields Inc. v. United States,* 723 F.2d 884 (Fed.Cir.1983).

**15.** We, like the court in *Continental Land Co. v. United States,* 88 F.2d 104, 108 (9th Cir.1937), take judicial notice of the fact that the Columbia River is a navigable stream both in law and in

fact. "When once found to be navigable, a waterway remains so." *United States v. Appalachian Power Co.,* 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940). This has been the position of the defendant throughout these proceedings, whereas the Tribes appeared to contest the navigability of at least that portion of the stream in issue. However, at oral argument they unequivocally conceded that the entire river was in fact a navigable waterway, thereby removing any factual disputes on this point.

*of the United States is the regulation of commerce on its waters. Navigability ... is but a part of the whole. Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control ... The* point is that the navigable waters are subject to national planning and control in the broad regulation of commerce granted [to] the federal government.

*United States v. Appalachian Power Co.,* 311 U.S. 377, 426–427, 61 S.Ct. 291, 308, 85 L.Ed. 243 (1940) (emphasis added), *quoted in Kaiser Aetna,* 444 U.S. at 174, 100 S.Ct. at 389.

■ It is by exercising its constitutional power to regulate navigation that Congress invokes the navigational servitude. It is well-settled that this doctrine is a "dominant servitude" which manifests a *superior* interest that Congress may assert to the exclusion of any competing or conflicting interest in a navigable waterway. *United States v. Twin City Power Co.,* 350 U.S. 222, 224, 76 S.Ct. 259, 261, 100 L.Ed. 240 (1956). The Court of Appeals for the Federal Circuit has recently stated:

> "The determination of the necessity for a given improvement of navigable capacity, and the character and extent of it, is for Congress alone.... [T]he rights of the title holder are subordinate to the federal Government in respect of navigation".... Thus, upon the determination of Congress to improve navigation, the navigational servitude defines the appropriate boundaries within which the United States can assert its power to supersede private ownership interests without creating an obligation to pay just compensation under the ... Fifth Amendment.

*Owen v. United States,* 851 F.2d 1404, 1408 (Fed.Cir.1988) (citations omitted).

■ The proper exercise of the servitude forecloses any duty to pay any compensation whatsoever for the taking of riverbed interests up to the ordinary high-water mark. *See, e.g., United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 267, 19 L.Ed.2d 329 (1967). More importantly

for the purposes of the matter before us, however, the government is not obligated to pay compensation for the taking of those fast lands with water-related values stemming from the flow of a navigable waterway. *Twin City Power,* 350 U.S. at 225–226, 76 S.Ct. at 261; *United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1912). "[W]hen the Government acquires fast lands to improve navigation, it is not required ... to compensate landowners for certain elements of damage attributable to riparian location, such as the land's value as a hydroelectric site...." *Kaiser Aetna,* 444 U.S. at 177, 100 S.Ct. at 391 (citations omitted). In such a case, the government must only pay fair value for the fast land taken for the project "... nothing for water power." *Appalachian Power,* 311 U.S. at 427, 61 S.Ct. at 309. " 'The exclusion of riparian owners' from the benefits of the power derived from the flow in a navigable stream 'without compensation is entirely within the Government's discretion.' " *Twin City Power,* 350 U.S. at 227, 76 S.Ct. at 262.

The reasoning for these decisions is best explained by the Supreme Court in *Twin City Power,* 350 U.S. at 228, 76 S.Ct. at 263:

> If the owner of the fast lands can demand water-power value as part of his compensation, he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses. The right has value or is an empty one dependent solely on the Government. What the Government can grant or withhold and exploit for its own benefit has a value that is peculiar to it and no other user enjoys.... To require the United States to pay for this water-power value would be to create private claims in the public domain.

(citations omitted).

**B.** *Is It A Multiple Purpose Project With Navigational Benefits, Or A Project for Reclamation Purposes Only?*

■ We now turn to a consideration of the threshold issue presented by this

case—whether Congress intended to create a multiple-purpose project with navigational benefits, thereby invoking the navigational servitude, or whether it intended to confer reclamation benefits only. The parties concede that this issue is a mixed question of law and fact. However, because the subject dispute is really a matter of statutory construction and of discerning congressional intent, both parties aver that there are no genuine issues of material fact.[16] We agree that this issue is in essence a question of law appropriate for summary judgment. Following a thorough examination of the legislative history of the project, the two statutes authorizing the project, and the relevant case law, we find *infra* that Congress intended to create a multiple-purpose project with navigational benefits, and that it thereby fully and properly exercised its constitutional power to preclude any payment of compensation for water power values regarding lands taken under the navigational servitude.

The Grand Coulee Dam was initiated as a public works project by the Administrator of Public Works, Harold L. Ickes, and President Roosevelt pursuant to the National Industrial Recovery Act of 1933, Pub.L. No. 73–67, Title II, §§ 201–207, 48 Stat. 195, 200–205, *formerly codified at* 40 U.S.C. §§ 401–403. *See Silas Mason Co. v. Tax Commission,* 302 U.S. 186, 191–192, 58 S.Ct. 233, 236, 82 L.Ed. 187 (1937); *Continental Land Co. v. United States,* 88 F.2d. 104, 105 (9th Cir.1937). The project was undertaken after an exhaustive 1932 Army Corps of Engineers survey, which recommended a comprehensive plan for the development of the Columbia River that "... *took into consideration the use of its waters for the purposes of navigation, flood control,* power development, and irrigation." *Silas Mason,* 302 U.S. at 191, 58 S.Ct. at 236 (emphasis added); *see Continental Land Co.* 88 F.2d at 105. *See also*

Army Corps of Engineers Report, *Columbia River and Minor Tributaries,* H.R. Doc. No. 103, 73d Cong., 1st Sess., vols. I & II (1932). On December 12, 1933, the Secretary of the Interior and the Administrator of Public Works signed an amended Declaration of Taking, which stated that 840.28 acres of land at the Grand Coulee Dam site "... are hereby taken for the use of the United States ... for the regulation, and control of the flow of the Columbia River, for a storage reservoir from the dam site to the Canadian boundary, *for the improvement of navigation,* for flood control, for hydroelectric power development at the Grand Coulee dam site, for the increase of power development downstream, for the reclamation of arid and semi-arid lands, for the domestic use of water, and for the relief of unemployment." *Silas Mason,* 302 U.S. at 194, 58 S.Ct. at 237 (emphasis added).

Congress, however, did not have an opportunity to pass on the project until 1935. Under the Rivers and Harbors Act of 1935, Pub.L. No. 74–409, § 2, 49 Stat. 1028, 1039, 1040, Congress specifically authorized and adopted the Grand Coulee Dam project. It stated:

> That for the purpose of controlling floods, improving navigation, regulating the flow of the streams of the United States, providing for the storage and for the delivery of stored waters thereof, for the reclamation of public lands and Indian reservations, and other beneficial uses, and for the generation of electric energy as a means of financially aiding and assisting such undertakings, the ... Grand Coulee Dam on the Columbia River [is] hereby authorized and adopted.... [17]

(emphasis added).

The defendant argues that the language of this legislation is a clear and unambig-

---

**16.** The plaintiffs have gone so far as to assure the court that any objections they might have to our decision here would *not* be premised on any alleged genuine issue of material fact. Tr. 97.

**17.** The Grand Coulee Dam project was re-authorized by the Act of March 10, 1943, Pub.L. No. 78–8, § 1, 57 Stat. 14, *codified at* 16 U.S.C. § 835, which provides that:

> *In addition to the primary purposes for which the Grand Coulee Dam project ... was authorized under the provisions of the Act of August 30, 1935,* (49 Stat. 1028), the project is authorized and reauthorized as a project subject to the Reclamation Project Act of 1939....
>
> (emphasis added).

uous reflection of the congressional intent to create a multiple-purpose project with navigational benefits. We are inclined to agree. We do so because "[t]he judgment of the Congress with relation to the navigability of the river and its development is conclusive." *Continental Land*, 88 F.2d at 109, *citing Arizona v. California*, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931). As stated in *Chandler–Dunbar*, 229 U.S. 53, 63–64, 33 S.Ct. 667, 672, 57 L.Ed. 1063 (1912):

> "It is for Congress to determine when its full power shall be brought into activity." ... *So unfettered is this control of Congress over navigable streams of the country that its judgment ... is conclusive.* Such judgment and determination is the exercise of the legislative power in respect of a subject wholly within its control.

(emphasis added) (citations omitted).

The role of the courts in matters involving the interpretation of congressional intent in its exercise of navigational powers was perhaps best explained by the Supreme Court in *United States v. Twin City Power Co.*, 350 U.S. 222, 224, 76 S.Ct. 259, 260–261, 100 L.Ed. 240 (1956):

> It is not for the courts, however, to substitute their judgments for congressional decisions on what is or is not necessary for the improvement or protection of navigation.... The role of the judiciary is a narrow one in any case.... *The decision of Congress that this project will serve the interests of navigation involves engineering and policy considerations for Congress and Congress alone to evaluate ... Courts should respect that decision until and unless it is shown "to involve an impossibility" ... If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced.*

(emphasis added) (citations omitted).

The Tribes have neither proven nor raised an issue that the congressional intent to construct the Grand Coulee Dam as a multiple-purpose project with navigation-

al benefits, as manifested in its statutory statement of purpose, involved "an impossibility." This shortcoming is not, however, the consequence of lack of effort on behalf of the Tribes. They adamantly contend that the Grand Coulee Dam *itself* was actually pursued as a reclamation project *only*, with no intent to aid navigation. The Tribes rely on *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), for the proposition that they are entitled to compensation for water-related rights when Congress undertakes a project for reclamation purposes only, notwithstanding a statement of congressional purpose, like that contained in the authorizing statute quoted above, invoking navigational benefits as a basis for the legislation. In that case, the owners of riparian water rights on the San Joaquin River, who were deprived of their water by the defendant's construction of the Friant Dam as part of what is known as the Central Valley Project, were permitted to recover water-related value compensation notwithstanding a congressional statement of purpose, including navigational benefits.

When looking at the Grand Coulee Dam only, apart from the remainder of the entire Columbia Basin project, the Tribes aver that the facts used to support the Supreme Court decision in *Gerlach* are indistinguishable from those present in this case. Specifically, they contend that, like *Gerlach*, statutory language invoking a legal fiction of navigational purposes is an insufficient exercise of the navigational servitude. In support of their belief that the project was in fact intended to aid reclamation only, the plaintiffs cite facts to the effect that construction of a high dam without locks prevented through navigation on the Columbia, that there was never any cost allocation for the improvement of navigation behind the dam on the reservoir, and that the cost allocations for navigational and flood control purposes below the dam were *de minimis* in comparison to the total cost of the dam.

Even if we agree with the Tribes that the scope of our inquiry is limited to an examination of the benefits that Congress intended to create by the construction of the Grand Coulee Dam and reservoir alone, we do not believe that *Gerlach* has any bearing on the subject dispute. We read *Gerlach* to stand only for the proposition that the taking of private rights may be compensable in *certain* limited cases where the legislative history necessarily requires a conclusion that Congress intended to recognize interests *previously* existing under state law, thereby intending to limit the exercise of its constitutional authority to assert the servitude. It does not provide a remedy where Congress intends to create real navigational benefits. In other words, if Congress intended to create *both* navigational and reclamation benefits, it may invoke the navigational servitude even in those cases where the navigational benefits are of lesser importance.[18] *See Twin City Power*, 350 U.S. at 223–224, 76 S.Ct. at 260–261.

In *Twin City Power*, the Supreme Court has sharply distinguished and strictly limited the applicability of *Gerlach* to those rare situations in which Congress has clearly failed to exercise its constitutional powers under the Commerce Clause. *Gerlach* was not applicable to the facts presented in *Twin City Power*, and it is not applicable to the facts presented here, which show no indication that Congress intended to exercise anything less than its full constitutional right to assert the servitude. Thus, we concur in *Twin City Power's* distinguishing interpretation of *Gerlach*, an interpretation which is plainly appropriate here:

The legislative history and construction of particular enactments may lead to the conclusion that Congress exercised less than its constitutional power, fell short of appropriating the flow of the river to the public domain, and provided that the private rights existing under state law

should be compensable or otherwise recognized. ... *We have a different situation here, one where the United States displaces all competing interests and appropriates the entire flow of the river for the declared public purpose.*

*Twin City Power*, 350 U.S. at 225, 76 S.Ct. at 261 (emphasis added).

To conclude otherwise would be tantamount to a finding that the congressional pronouncements of a navigational purpose in both the Rivers and Harbors Act of August 30, 1935, Pub.L. No. 74–409, § 2, 49 Stat. 1028, 1039, 1040, and the Act of March 10, 1943, Pub.L. No. 78–8, § 1, 57 Stat. 14, *codified at* 16 U.S.C. § 835, were nothing more than an idle utterance. Such a circumstance would be contrary to the well-established principle that presumes public officials will act properly in the performance of official duties in the absence of " 'well-nigh irrefragable proof.' " *See, e.g., Gregory Lumber Co., Inc. v. United States*, 11 Cl.Ct. 489 (1986), *aff'd*, 831 F.2d 305 (1987) (citation omitted). The contention that Congress attempted to attribute navigational benefits to the Grand Coulee solely because it was concerned about the constitutional authority to undertake such projects under the welfare powers, *see generally United States v. Arizona*, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935), does not cut muster.

There has been no showing that Congress in fact intended to compensate the Tribes for any pre-existing property rights, whatever those interests may have been. Nor has there been an adequate showing that Congress either failed to contemplate any *real* navigational benefits to be derived from construction of the Grand Coulee Dam project, or that it acted outside its constitutional power in designating navigational benefits when it authorized the project. We find this to be true irrespective of the relative size of those contem-

---

**18.** The Tribes have expressly conceded that Congress can undertake a project for multiple purposes. They further concede that the navigational servitude may be exercised in aid of such a project even in those cases where the navigational benefits are not as significant as contemplated. They contend only that the servitude

cannot be exercised on a reclamation project which Congress attempts to transform into a multiple purpose project through the invocation of "attenuated" navigational purposes. Plaintiffs' Reply to Defendant's Response to Plaintiffs' Cross–Motion for Summary Judgment, p. 20.

plated navigational benefits. As we have already observed, "[i]f the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced." *Twin City Power*, 350 U.S. at 224, 76 S.Ct. at 261.

As the Supreme Court has stated in the context of flood control, which is also subject to paramount congressional powers to regulate and assert the servitude under the Commerce Clause:

> It is for Congress alone to decide whether a particular project, by itself or as part of a comprehensive scheme, will have such a beneficial effect on the arteries of interstate commerce.... That determination is legislative in character ... the fact that the project [has] a multiple purpose [is] irrelevant to the constitutional issue ... as [is] the fact that power was expected to pay the way ... "[t]he fact that ends other than [navigation] will also be served, or that [navigation] may be relatively of lesser importance, does not invalidate the exercise of authority conferred on Congress."

*United States v. Grand River Dam Authority*, 363 U.S. 229, 232–233, 80 S.Ct. 1134, 1136–1137, 4 L.Ed.2d 1186 (1960), *quoting State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 527–534, 61 S.Ct. 1050, 1060–1063, 85 L.Ed. 1487 (1941).

Because the Rivers and Harbors Act clearly and unquestionably demonstrates the required congressional intent to authorize and confer navigational benefits in the process of constructing the Grand Coulee Dam, we see no need to review the legislative history of that Act. "[T]he legislative history cannot be used to create ambiguity where there is none in the statute." *Texas State Commission for the Blind v. United States*, 796 F.2d 400, 420 (Fed.Cir.1986).[19] Nevertheless, while we think it is patently clear that we are not required to do so in this case, an examination of the legislative history clearly discloses that Congress did in fact contemplate *real* navigational benefits for the project.[20] We, therefore, agree with the defendant that the legislative history is peppered with indications of congressional intent to create some navigational benefits through the construction of the Grand Coulee Dam, thereby demonstrating an implicit congressional intent to assert the navigational servitude to the fullest extent.

This conclusion is fully supported by the Army Corps of Engineers Report, *Columbia River and Its Minor Tributaries*, H.R. Doc. No. 103, 73d Cong., 1st Sess., vols. I and II (1932), which, along with the House floor debates on the inclusion of the Grand Coulee Dam in the Rivers and Harbors Act, *see infra*, comprises all of the *legislative* history on the benefits that might be derived from the proposed project.[21] This

**19.** In *Texas State Commission*, 796 F.2d at 420, n. 19, the CAFC notes that our sole function in those cases, like this one, where the applicable statutory constitutional language is plain and where the statute is within constitutional boundaries, is to enforce the law according to its terms. "Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the Rules which are to aid doubtful meanings need no discussion." *Id.* (citations omitted).

**20.** In *Gerlach*, 339 U.S. at 732, 70 S.Ct. at 958–959, n. 2, the Supreme Court observed that there were never any real navigational benefits to be derived from the Friant Dam development. Even the most cursory analysis of the facts presented here demonstrates that there were some navigational benefits derived from the Grand Coulee. Unlike the situation presented in *Gerlach*, the 1932 Corps of Engineers Report upon which the entire project was commenced "... took into consideration the use of its waters

for the purposes of navigation...." *Silas Mason*, 302 U.S. at 191, 58 S.Ct. at 236. These navigational purposes were reflected in testimony presented at the dam site condemnation proceedings in *Continental Land Co.*, 88 F.2d at 105:

> [T]he proposed dam at the present site *will serve the purposes ... the improvement of navigation by creating a lake 150 miles long, running from the dam to the Canadian border and by regulation of the low flow of the river and increasing it, will improve navigation all the way from the dam site to the coast ....* (emphasis added).

**21.** This fact is demonstrated by the Congressional recognition and implicit adoption of that document during debate on the proposed inclusion of the Dam in the Act. *See* Cong.Rec. 13,725 (August 19, 1935). There, Congressman Samuel B. Hill explained to the rest of the House:

> Under authority of Congress, the War Department engineers made a survey of the Co-

Report served as the basis upon which Harold L. Ickes, acting as both the Secretary of the Interior and the Federal Emergency Administrator of Public Works, included the Grand Coulee Dam as part of the Public Works Program undertaken pursuant to the National Industrial Recovery Act in June, 1933. *See Silas Mason*, 302 U.S. at 191–192, 58 S.Ct. at 236; *Continental Land Co.*, 88 F.2d at 105. *See also,* Cong. Rec. 13,725 (August 19, 1935). While we recognize that the Report considers a multitude of benefits and drawbacks to be gained from construction of the Grand Coulee Dam, the Report clearly contemplates some navigational benefits. Equally plain, it does not premise its recommendations on the theory that only reclamation benefits would flow from the construction of the project.

That Congress intended more than just reclamation benefits for the Grand Coulee Dam is evident from the House floor debate that took place when the project was included in the Rivers and Harbors Act legislation. That legislation, as originally proposed, would have excluded the Grand Coulee Dam because some Congressmen were of the view that the Dam was indeed for reclamation purposes only, and thereby attempted to exclude it from inclusion in the Rivers and Harbors Act altogether. *See* Cong. Rec. 13,723–13,729 (August 19, 1935). Congressman Sam Hill of Washington, however, moved to amend the Act to include the Grand Coulee Dam in the Act for the reasons stated therein, explaining that it would serve many purposes beyond reclamation benefits only. Like Secretary Ickes before him, Congressman Hill quite obviously relied on the recommendations found in the aforementioned Army Corps of Engineers Report as the basis for his proposed amendment. As justification for its inclusion in the Act, Congressman Hill pointed out that the Dam would serve the interests of power generation *and navigation.*

In the specific context of navigational purposes that would flow from the construction of the Dam, Congressman Hill stated:

> The Grand Coulee Dam is the key dam ... *for the improvement of that river.* It is this dam that equalizes the flow of all the river down below. It will deepen the channel of the Columbia River on an average of 5 feet by evening the flow, so that we could have barge and boat traffic below there.... This Grand Coulee Dam is the one in the upper reaches of the river to be built, because it is an important key dam to even the flow of water and all development below that point in the river.

79 Cong.Rec. 13,726 (August 19, 1935).

Following a fairly extended debate, Congressman Hill's proposed amendment passed muster. Cong. Rec. 13,729 (August 19, 1935). Two hundred and one (201) congressmen voted in favor of including the Grand Coulee Dam in the Rivers and Harbors Act. The Senate thereafter concurred with the amendment approved in the House, Cong.Rec. 13,793 (August 20, 1935), and was signed into law by the President, Cong. Rec. 14,821 (August 26, 1935). We must necessarily conclude that the Grand Coulee Dam was included in the Rivers and Harbors Act in recognition of the purposes stated at the outset of that Act—which *expressly* stated that navigational benefits would be served. By voting in favor of the amendment, we must also conclude from the nature of the debate in the House that Congress rejected any notion that the Grand Coulee Dam would confer reclamation benefits only.

We also find significant indications of a congressional intent in the legislative history of subsequent appropriations acts for the continuing construction of the Dam. For example, such intent was again manifest when the House first appropriated funds in 1936. Congressman Hill, speak-

---

lumbia River system and they filed a report. This report set out how this great stream should be developed for navigation, for power, for flood control and for irrigation. This report [Army Corps of Engineers Report, *Co-*

*lumbia River and Its Minor Tributaries,* H.R. Doc. No. 103, 73d Cong., 1st Sess., vols. I and II (1932) ] is available to members of Congress....

ing again on behalf of the benefits to be derived from the Grand Coulee stated:

> When this dam is completed to its ultimate height it will increase the depth of the flow in the river which is immediately below the dam 6.9 feet ... thus deepening the channel for navigation. About 100 miles below the dam it will increase the depth of the flow 5½ feet, and on down farther ... it will increase the depth of the flow 4.4 feet....
>
> I give you those figures so that you may understand what it means for the navigation of the river. Ocean-going vessels at this time come up the Columbia River from the mouth as far as Portland, and above Portland, but they have to keep dredging the river in order to keep the channel open for ocean-going vessels. This will aid, to the extent of three feet, the navigability of the river below the Bonneville Dam, and will improve navigation above the Bonneville as indicated above.
>
> The Grand Coulee Dam is the key structure for the development of the Columbia River. This dam will create a reservoir 150 miles long, extending clear back to the Canadian line....
>
> [F]rom the standpoint of power development and from the standpoint of navigation this improvement is justified. [A]nd it follows, of course, that the holding back of these matters in the great reservoir behind the Grand Coulee Dam ... will control flood conditions in the river.

80 Cong.Rec. 7,649 (May 20, 1936).

Again, the congressional intent to confer significant navigational benefits and exercise the navigational servitude was apparent in *Navigation and Flood Control on the Columbia River and Its Tributaries: Hearings on S. 869, S. 3330, S. 4178, & S. 4566 Before the Subcomm. on Comm. on Agriculture and Forestry*, 74th Cong., 2nd Sess. (1936):

> MR. DANA. Lower on the Columbia, Senator, the construction of the Grand Coulee Dam, although primarily for reclamation and power, has been deemed to be important in the matter of flood control and in stabilizing the flow of the Columbia below the Grand Coulee Dam into the lower reaches of the stream. That would be an effect itself not only in aid of navigation but in increasing the firm power head at the Bonneville plant. Some estimates have been made that the firm head of power at Bonneville would be thereby increased by 50 percent.
>
> SENATOR POPE. *But there is no question that this would have a very important effect upon navigation, the construction of the Grand Coulee, and the other dams contemplated.*
>
> MR. DANA. *Yes, sir.*
>
>   *   *   *   *   *   *
>
> SENATOR NORRIS. I am quite anxious about this, because *I want the record to show that, in good faith, we are improving navigation, and these other things are incident to it.*
>
> MR. DANA. The improvement of navigation on the Columbia River is a vital factor in the development of the Pacific Northwest. The study of the measures necessary to improve navigation, to create it, aids to carry navigation farther inland, to enlarge the volume of freight handled, to stimulate productive resources and prompt marketing of our products has all been given most earnest study, and the study is still underway.

(emphasis added).

Given the operative statutory language, the instructive legislative history, and the applicable case law, we are compelled to conclude that Congress did indeed intend to aid navigation in its authorization and construction of the Grand Coulee Dam. We find that the navigational benefits, whatever their quantum may have been, were more than sufficient to invoke the navigational servitude in the case at bar. Moreover, we find that the legislative history is patently clear that Congress did not intend to undertake the Grand Coulee Dam project for reclamation purposes *only* to the exclusion of valid navigational purposes. We are constrained to hold, therefore, that Congress fully intended to exercise the navigational servitude in carrying out the subject project. The effect of said intent is to preclude both any obligation to

pay compensation for riverbed lands taken up to the ordinary high-water mark and any water power values attached to either the riverbed or fast lands taken for the purpose of aiding in the construction of the Grand Coulee Dam and Franklin D. Roosevelt Reservoir.

### C. *Is the Navigational Servitude Superior to Any And All Of The Indian Claims Presented Here?*

■ Having concluded that Congress intended to confer important navigational benefits on the Columbia River in its authorization of the Grand Coulee Dam and Franklin D. Roosevelt Reservoir, thus properly exercising its right to assert the navigational servitude, we next address what the Tribes have termed the "ultimate" issue in this case. Namely, we must decide whether, notwithstanding the proper exercise of navigational servitude, any of the theories upon which the Tribes have premised their claims for compensation will subordinate the defendant's navigational servitude defense. We hold that they do not. Why? Simply because the constitutional power to assert the navigational servitude is dominant over any and all interests when it is properly exercised through an appropriate manifestation of congressional intent, as here in the Rivers and Harbors Act of August 30, 1935. In that connection, the Supreme Court stated in *Twin City Power*, 350 U.S. at 224, 76 S.Ct. at 261, that the Commerce Clause "is a dominant one which can be asserted to the exclusion of any competing or conflicting one." Therefore, we hold that the navigational servitude, having been fully and properly exercised by Congress, exonerates the defendant from any obligation to pay additional compensation to the Tribes under any and all of the theories presented here.

Supportive of the foregoing, we find the Supreme Court decision in *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987), extremely persuasive, if not dispositive, on the issues asserted by the Tribes here. In *Cherokee Nation*, the Court held that Indians who held fee title to certain riverbed lands that were taken in the aid of a navigational project were not entitled to any compensation under the Fifth Amendment to the Constitution because their interests were subject to the paramount powers of the sovereign's assertion of the navigational servitude. In recounting the supremacy of the constitutional power to assert the servitude, the Supreme Court stated:

> Any other conclusion would be wholly extraordinary, for *we have held that the navigational servitude applies to all holders of riparian and riverbed interests....* Indeed, even when the sovereign States gain "the absolute right to all of their navigable waters and the soils under them for their own common use" by operation of the equal footing doctrine ... this "absolute right" is unquestionably subject to "the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce".... If the States themselves are subject to this servitude, we cannot conclude that respondent—though granted a degree of sovereignty over tribal lands—gained an exemption from the servitude simply because it received title to the riverbed interests. Such *a waiver of sovereign authority will not be implied, but instead must be "surrendered in unmistakable terms."*

*Id.*, 480 U.S. at 706–707, 107 S.Ct. at 1492 (emphasis added) (citations omitted).

That the Tribes' interests, like all riparian interests subject to the paramount power of the sovereign's assertion of the Commerce Clause, are completely subordinate to the defendant's exercise of the navigational servitude in this case cannot, in our view, be disputed. The paramount nature of the servitude has been repeated so many times over the years that its dominance seems to be beyond question:

> *All navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although title to the shore and submerged soil is in the ... individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal Government by the Constitution.*

*Chandler–Dunbar*, 229 U.S. at 63, 33 S.Ct. at 672 (emphasis added). These principles of supremacy were restated even more forcefully by the Supreme Court in later decisions wherein it stated that:

> [*Riparian owners*] *hold the waters and the lands under them subject to the power of Congress to control the waters for the purpose of commerce.* The power flows from the grant to regulate, *i.e.,* to "prescribe the rule by which commerce is to be governed". . . . *The Federal Government has domination over the power inherent in a flowing stream. It is liable to no one for its use or nonuse. The flow of a navigable stream is in no sense private property; "that the running water in a great navigable stream is capable of private ownership is inconceivable." Exclusion of riparian owners from its benefits without compensation is entirely within the Government's discretion.*

*Appalachian Power Co.*, 311 U.S. at 423–424, 61 S.Ct. at 307 (emphasis added) (citations omitted).

It is therefore clear beyond cavil that *all* water-value interests, including whatever interests the Tribes may have held and lost here, have been totally subordinated by the defendant's full and proper assertion of the servitude. It is also equally clear that the Tribes have completely failed to establish, as they must under the principles stated in *Cherokee Nation,* that the defendant waived this sovereign authority in *express* language. Moreover, it can hardly be disputed from the legislative history that the defendant at any time "surrendered in unmistakable terms" or otherwise the right to regulate and aid navigation at the Grand Coulee Dam site. Certainly, there is no language that can be construed as a waiver of sovereign authority in the Rivers and Harbors Act of August 30, 1935.

More importantly, it is evident that there is no explicit language in § 2 of the ICCA by which the defendant can be held to have divested itself of the paramount power to exercise the servitude. In fact, we are unable to find even the slightest suggestion in that statute that would indicate that the defendant ever intended to limit, waive, or compromise the exercise of this omnipotent constitutional power. Against this background, therefore, it is patently clear that the Tribes have failed to rebut one of the most basic presumptions of statutory construction, *i.e.,* the intent to extinguish *pre-existing public rights* or privileges, like the right to assert the waiver of navigational servitude, *cannot* be established by implication, "but must be surrendered in unmistakable terms." *Cherokee Nation,* 480 U.S. at 707, 107 S.Ct. at 1492. The shortcomings of the arguments presented by the Tribes with respect to the foregoing are apparent upon even the most cursory examination of § 2 of the ICCA.

Clause (3) of § 2 of the ICCA, which requires us to ". . . hear and determine . . . claims which would result if the treaties, contracts and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity," is clearly inapplicable to this case. Clause (3) merely provides a forum for these specific causes of action for Indian claimants by waiving the statute of limitations or laches defenses. *See Otoe and Missouria Tribe of Indians v. United States,* 131 Ct.Cl. 593, 598–599, 131 F.Supp. 265, 269 (1955). In addition, as we understand the arguments before us, the Tribes have never alleged a traditional equity claim in this case. Clause (4), providing for consideration of ". . . claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant," is equally clear in its lack of explicit (and even general) language tending to show that the defendant waived any right to assert sovereign powers, let alone the navigational servitude. Moreover, when Congress exercises the navigational servitude and appropriates land for a project in the aid of navigation, within constitutional limitations of course, such action

has never been considered a "taking" in the traditional sense as obviously contemplated by clause (4).

To the contrary, the exercise of the servitude is instead an assertion of a *superior public right in the nation's navigable waters.* The Supreme Court has held on innumerable occasions that riparian interests subject to the navigational servitude are not property rights recognized under the Constitution.

> The interest of the United States in the flow of a navigable stream originates in the Commerce Clause. *That Clause speaks in terms of power, not property.* But the power is a dominant one which can be asserted to the exclusion of any competing or conflicting one. The power is a privilege which we have called a "dominant servitude" ... or "a superior navigation easement."

*Twin City Power,* 350 U.S. at 224–225, 76 S.Ct. at 261 (emphasis added) (citations omitted).

The fact that the sovereign's assertion of the navigational servitude does not, when exercised properly, constitute a traditional taking was perhaps best stated by the Court of Appeals for the Federal Circuit, when it opined that:

> [The] power to regulate navigation confers upon the United States a "dominant servitude".... *The proper exercise of this power is not an invasion of any property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.* United States v. Chicago, M., St. P. & P.R. Co., 312 U.S. 592, 596–597, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941).

*Owen,* 851 F.2d at 1408 (emphasis added), *quoting United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 267, 19 L.Ed.2d 329 (1967).

Finally, we address clause (5) of ICCA § 2, which is the averred authority upon which the Tribes have premised the lion's share of their hopes for recovery. That clause requires us to "hear and determine ... claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." The plaintiffs contend that this clause, as styled, is in effect a waiver of sovereign immunity [22] under which claims must be weighed against a standard of "fairness, honor and morality." The application of these standards in the Tribes' view, were intended to supersede the defendant's "immunity" from the obligation to pay just compensation for property taken pursuant to an exercise of the navigational servitude.

In fact, at oral argument they attempted to distinguish *Cherokee Nation, supra,* by averring that it has no bearing on this case simply because it allegedly decided only constitutional issues. Thus, the Tribes blandly urge us to find that they are not subject to the overwhelming authority found in the above-cited cases, which unequivocally preclude any recovery whatsoever beyond the payment of ordinary compensation for fast lands taken in aid of navigation. *See, e.g., Twin City Power,* 350 U.S. at 227, 76 S.Ct. at 262, *quoting Appalachian Power,* 311 U.S. at 424, 427, 61 S.Ct. at 307, 309. They take this hospitable position because those cases were allegedly decided without reference to extra-legal standards.

We reject the Tribes' argument. We do so because we find that where navigation is intended to be aided, the sole limitation is whether this expansive power was properly asserted. *See, e.g., Kaiser Aetna,* 444 U.S. at 174–175, 100 S.Ct. at 390. The interests deserving compensation have always been

---

**22.** In *Otoe and Missouria Tribe of Indians v. United States,* 131 Ct.Cl. 593, 598, 131 F.Supp. 265, 269 (1955), our predecessor court stated:
> We think it is quite clear from the face of the Indian Claims Commission Act that in its passage Congress was, *to a certain extent,* exercising its political function of creating new causes of action and recognizing liability in the United States, *if the facts warranted,* in connection with such causes.
> (emphasis added).

those taken by an *improper* exercise of the servitude, such as in those cases where Congress never intended to assert the power at all, *see, e.g., United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), or where the sovereign's attempted assertion of the servitude has been too broad in scope, *see, e.g., United States v. Kansas City Life Insurance Co.,* 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); *Owen v. United States,* 851 F.2d 1404 (Fed.Cir.1988). Consequently, no court has found a requirement for the payment of compensation for an assertion of the servitude over either "... the entire stream and the stream bed below [the] ordinary high-water mark," *e.g., Owen,* 851 F.2d at 1408, or any water power values attributed to riverbed and fast lands acquired to improve navigation, *e.g., Twin City Power,* 350 U.S. at 226, 76 S.Ct. at 261, in the absence of a specific waiver of the right to assert that power by treaty, agreement, or otherwise, *cf. Cherokee Nation,* 480 U.S. at 707, 107 S.Ct. at 1492.[23]

Moreover, it is obvious that Congress did not surrender any right to assert its sovereign powers under the Commerce Clause, much less the power to exercise the navigational servitude over Indian lands, in either explicit or implicit terms when it enacted the fair and honorable dealings clause of the ICCA. In that sense, the limited waiver of sovereign immunity contained in that statute is not nearly as broad as the Tribes would have us believe, and in no sense implicates navigational servitude. In interpreting § 2 of the ICCA, our predecessor court stated:

Whether a statute is to be construed strictly or liberally depends on which construction will make the legislative intent and purpose effective. A liberal construction will not justify an extension of the scope of the statute beyond the obvi-

ous contemplation of the legislature, even though the statute be purely remedial in nature and the construction proposed will produce a most desirable result....

The Indian Claims Commission Act is both remedial legislation and special legislation. It broadens the Government's consent to suit and as such is in derogation of sovereignty.... *[I]t was designed to correct certain evils of long standing and well known to Congress. Fortunately, under these circumstances ... it should be possible to construe the statute liberally to effect its remedial purpose and intent, and ... strictly to limit undue abrogation of fundamental rights or to prevent undue extension of extraordinary remedies.*

*Otoe and Missouria Tribe of Indians,* 131 Ct.Cl. at 602, 131 F.Supp. at 271 (emphasis added).

Clearly, no matter whether the fair and honorable dealings clause of the ICCA is construed liberally or strictly, the Tribes have no right to recover for water power values upon the defendant's proper assertion of the navigational servitude. There is clearly no authority to suggest that Congress intended such a result when it enacted the ICCA, nor have the plaintiffs cited to any legislative history which produced the Act tending to support such an intent. Our refusal to provide compensation in the absence of a "surrender in unmistakable terms," as required by the Supreme Court decision in *Cherokee Nation,* is entirely consistent with the construction set out in *Otoe and Missouria Tribe of Indians* —the ICCA must be strictly construed to reject the Tribes' unjustified efforts to abrogate the government's fundamental constitutional right to assert the navigational servitude. Any other course would, in our

---

**23.** The Tribes attempt to distinguish *Cherokee Nation* on the fact that the Supreme Court did not specifically address the Indians' fair and honorable dealings claim. *Id.,* 480 U.S. at 702, n. 1, 107 S.Ct. at 1489, n. 1. We see no significance in this point, as it means no more than that the issue was not presented in the case. As demonstrated in that case and others, there is no precedent which would permit the Tribes

here to transcend the defendant's paramount constitutional power to assert the navigational servitude in the "absence of a surrender in unmistakable terms." *See id.,* 480 U.S. at 707, 107 S.Ct. at 1492. In other words, we firmly believe that the waiver of that sovereign authority must be unequivocally expressed regardless of whether the claim is being pursued on legal, equitable, or extra-legal grounds.

view, produce "an undue extension of ordinary remedies." [24]

The Tribes' heavy reliance on *Burkhardt v. United States*, 113 Ct.Cl. 658, 84 F.Supp. 553 (1949), which they cite for the proposition that the defendant is required to pay compensation under the standard of fairness, honor, and morality, notwithstanding the sovereign's exercise of the navigational servitude, is misplaced. The plaintiffs in that case sought compensation for hydroelectric power loss at its plant occasioned by the government's construction of a dam in aid of navigation. The claim was ultimately rejected by the Supreme Court on the basis of the government's exercise of the navigational servitude. *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945). Subsequently, Congress passed legislation authorizing the Secretary of the Treasury to pay compensation for the specific injuries earlier rejected by the Court, and referred the matter to the Court of Claims for consideration. There the primary issue was whether Congress had the authority to create a new cause of action and appropriate funds to pay for that claim where none previously existed, all based on moral and honorary claims not cognizable in a traditional juridical sense. The court answered yes to all counts, thereby superseding the navigational servitude and establishing what has been described as a broad, no fault approach on equitable claims in congressional references. [25]

*Burkhardt*, we hold, provides no support to the Tribes' position here. First and foremost, its effect is limited by the fact that it was a congressional reference case, standards which we do not believe have any direct applicability to a claim under the ICCA, § 2, clause (5). *Burkhardt* really only established congressional power to authorize, and judicial power to recommend, express extra-legal remedies on a no fault

basis. Secondly, the court was empowered to consider and recommend the recovery sought and obtained by the plaintiff in *Burkhardt* through *explicit* congressional authorization, a recommendation over which Congress retained the power to accept or reject as it saw fit. Such is not the situation here; there was no reference by which Congress expressly granted the authority for us to subordinate the defendant's constitutional powers to the Tribes' fair and honorable dealings claim. These limitations were recognized by our predecessor court: "Such losses may be compensated by legislative authority, not by force of the Constitution alone." *Burkhardt*, 113 Ct.Cl. at 666, 84 F.Supp. at 558, *quoting United States v. Willow River Power Co.*, 324 U.S. at 510, 65 S.Ct. at 767.

The court in *Burkhardt* stated further that:

> It must be recognized that the private property of citizens of the United States is at all times "impressed" with the superior rights of the Government incidental to the express power to regulate commerce … the title to all lands submerged and along the shores of navigable streams is at all times subject to the servitude in respect of navigation created in favor of the Federal Government by the Constitution….
>
> *What has happened to these plaintiffs has happened many times before to others, as it is bound to happen to others in the future. Under our views, whether these or any other plaintiffs are to be compensated by the Government for the taking of their property is a matter exclusively for the determination of Congress.*

*Id.*, 113 Ct.Cl. at 669, 84 F.Supp. at 559–560 (emphasis added).

---

**24.** In addition, we would be unable to grant the Tribes' motion even if a fair and honorable dealings claim could subordinate a defense based on the navigational servitude because such a claim is inherently a fact question that is subject to dispute between the litigants.

**25.** *Merchants National Bank of Mobile v. United States*, 7 Cl.Ct. 1, 9, n. 6 (1984), distinguished the

concept established in *Burkhardt* with the opposite view requiring government wrongdoing as a foundation for equitable claims in congressional reference cases, as espoused in *B. Amusement Co. v. United States*, 148 Ct.Cl. 337, 342, 180 F.Supp. 386, 390 (1960).

▮ We also reject the Tribes' claim that they are entitled to additional compensation for water-related values under traditional legal principles. In this context, we find that the defendant has never assumed any special obligation to secure water power values for the tribal lands taken in and of the Grand Coulee Dam project.[26] We are unable, therefore, to find any explicit undertaking in the legislation upon which the Tribes rely;[27] no such language or intention exists in the Act of June 25, 1910, Pub.L. No. 61–313, § 13, 36 Stat. 855, 858, *formerly codified at* 43 U.S.C. § 148,[28] nor can any such language or intent be found in § 14 of that same Act, Pub.L. No. 61–313, 36 Stat. 855, 859, *codified at* 25 U.S.C. § 352.[29]

On its face, that Act applies solely to power or reservoir sites needed for irrigation projects, and has no effect on projects commenced in aid of navigation. More importantly, neither section betrays any congressional intent to pay the Tribes for water power values derived from a project undertaken in part for navigational pur-

poses. Certainly, in the case at bar there was no "surrender in unmistakable terms" of the right to exercise the navigational servitude. *See Cherokee Nation,* 480 U.S. at 707, 107 S.Ct. at 1492. The sovereign's power is paramount and we discern nothing in the statute to suggest that the defendant intended to divest itself of that power with respect to any Indian tribe, much less the plaintiffs here. We therefore find that both *Confederated Salish and Kootenai Tribes v. United States,* 181 Ct.Cl. 739 (1967), and *United States v. 5,677.94 Acres of Land,* 162 F.Supp. 108 (D.Mont.1958), are inapposite.

*Conclusion*

We find, therefore, that the defendant constructed the Grand Coulee Dam as a multiple-purpose project with navigational benefits. As a consequence, it thereby intended to and did fully exercise its constitutional servitude. The servitude as exercised is, in turn, a superior right which we hold forecloses any obligation to pay additional compensation under the present cir-

26. In view of the holding in *Cherokee Nation,* 480 U.S. at 707, 107 S.Ct. at 1492, we also find that the Tribes cannot recover on any breach of fiduciary obligation theory. As noted in that case, Indian land trust principles "... do not create property rights where none would otherwise exist ... the tribal interests at issue here simply do not include the right to be free from the navigational servitude."

27. The Tribes also seem to suggest that § 2 of the Act of June 29, 1940, Pub.L. No. 76–690, § 2, 54 Stat. 703, *codified as amended at* 16 U.S.C. § 835e, which authorizes the payment of ordinary compensation for fast lands taken in aid of the Grand Coulee Dam, should be construed to permit the recovery sought here. Once again, because there is no congressional intent to subordinate the right to assert the navigational servitude, we reject this contention. In fact, we think the wording of that statute necessarily reads to the conclusion that Congress intended to reserve the power to assert the servitude, thereby obligating itself to pay no more than ordinary compensation.

28. Section 13 of the Act provided:
**Withdrawal of lands in Indian Reservations for Power or Reservoir Sites.**
    The Secretary of the Interior is authorized, in his discretion, to reserve from location, entry, sale, or allotment, or other appropriation any lands within any reservation, valu-

able for power or reservoir sites, or which may be necessary for use in connection with any irrigation project authorized by Congress: Provided, That if no irrigation project shall be authorized prior to the opening of any Indian reservation containing such power or reservoir sites the Secretary of the Interior may, in his discretion, reserve such sites pending future legislation by Congress for their disposition.

29. Section 14 of the Act provides:
**Cancellation of Trust Patents Within Power or Reservoir Sites.**
    The Secretary of the Interior, after notice and hearing, is hereby authorized to cancel trust patents issued to Indian allottees for allotments within any power or reservoir site and for allotments ... as are located upon or include lands set aside, reserved, or required within any Indian reservation for irrigation purposes under authority of Congress: Provided, That any Indian allottee whose allotment shall be so cancelled shall be reimbursed for all improvements on his cancelled allotment, out of any moneys available for the construction of the irrigation project for which the said power site may be set aside: Provided further, That any Indian allottee whose allotment, or part thereof, is so cancelled shall be allotted land of equal value within the area subject to irrigation by any such project.

cumstances for water-related values. This power is paramount to all claims raised by the Tribes here, both extra-legal and legal. The plaintiffs' motion is DENIED in full, while the defendant's motion is GRANT-ED. There being no liability on the defendant's behalf, the petition is hereby dismissed. The Clerk shall enter judgment accordingly. No costs.

IT IS SO ORDERED.